*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2003 FED App. 0341P (6th Cir.)
File Name: 03a0341p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

DANIEL R. ARBAN,
    *Plaintiff-Appellee/*
    *Cross-Appellant,*

    *v.*

WEST PUBLISHING CORP.,
    *Defendant-Appellant/*
    *Cross-Appellee.*

Nos. 01-2278/2370

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 99-73520—Bernard A. Friedman, District Judge.

Argued: June 13, 2003

Decided and Filed: September 24, 2003

Before: KEITH, MOORE, and GIBBONS, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Abraham Singer, PEPPER HAMILTON, Detroit, Michigan, for Appellant. William G. Tishkoff, LONG, BAKER & TISHKOFF LLP, Ann Arbor, Michigan, for Appellee. **ON BRIEF:** Abraham Singer, Michelle

Motowski Lund, PEPPER HAMILTON, Detroit, Michigan, for Appellant. William G. Tishkoff, Marvin B. Bartlett, LONG, BAKER & TISHKOFF LLP, Ann Arbor, Michigan, for Appellee.

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge. Daniel R. Arban brought this action against West Publishing Corporation (West) pursuant to the Family Medical and Leave Act (FMLA), 29 U.S.C. § 2611 *et seq*. Arban alleged that West violated the FMLA by terminating him while he was on medical leave and by failing to reinstate him at the completion of the leave. Arban also alleged that West violated the FMLA by interfering with, restraining, or denying him his right to take an FMLA leave. The case was tried before a jury, which returned a verdict in favor of Arban. West then filed a motion for judgment as a matter of law or for a new trial, which the district court denied. West appeals. Arban cross-appeals the district court's denial of front pay and liquidated damages and the district court's grant of a stay without bond. For the reasons set forth below, we affirm the district court's denial of West's motion for judgment as a matter of law or for a new trial, reverse and remand the trial court's denial of an award of liquidated damages, affirm the district court's denial of Arban's claim for front pay, and affirm the district court's grant of a stay without bond.

## I.

Arban began working as a sales representative for Lawyer's Cooperative Publishing in 1995. Lawyer's Cooperative Publishing merged with West in 1996. Arban has a documented history of gastrointestinal problems, including chronic and severe esophagitis and irritable bowel syndrome, which began in the middle of 1995 or early 1996. In 1997,

Arban was promoted from a field sales representative to a regional field sales manager. In this position, he supervised other representatives, while continuing to make sales. In January 1998, Arban voluntarily returned to the position of field sales representative in order to spend more time with his children. At that time Arban's immediate supervisor was Robert Wolfe, who held the position of regional field sales manager. Wolfe, in turn, reported to Nick Nicolini, who served as senior regional field sales manager, and to James Colantino, who served as director of sales.

In February 1998, Richard Carlson, who had replaced Arban as a regional field sales manager, learned that the preexisting account of the Hervas, Sotos law firm in suburban Chicago had been cancelled, that a new account had been generated in the name of James Sotos, and that Arban had misrepresented this account as "a new sales activity." Carlson brought this information to the attention of Wolfe, Nicolini, and Arban. On April 1, 1998, Arban received a warning letter from Wolfe, which stated:

> I cannot overstate the seriousness of the situation. . . . West Online Solutions will now be responsible for supporting an account where the revenue has been cut in half. . . . This letter will warn you that misrepresentations concerning an account are unacceptable to WEST GROUP. I am confident that there will be no future occurrence of such activity. However, I must include that any future occurrence will subject you to further disciplinary action, up to and including termination from West Group.

On December 16, 1998, Wolfe, Nicolini, and Carlson met with Arban to discuss additional violations of company policy committed by Arban and customer complaints that allegedly had occurred in the intervening months. According to an e-mail sent to Colantino by Wolfe the following day, the meeting began "with a reminder that Dan has been involved in switching names of accounts to achieve new sales that

resulted in Dan benefitting from the sale." Wolfe, Nicolini, and Carlson then inquired about the "[i]nconsistency with [Arban's] reported numbers." According to Wolfe, Arban admitted "lack of follow up in getting his orders in." Wolfe also asked Arban about "sending in orders that do not have signatures," and Arban admitted that on at least nine occasions he "did not talk to the decision maker to get a verbal approval." Wolfe explained to Arban that "this is not allowable for Field Reps and is an abuse of our process." In his e-mail, Wolfe noted that Arban also "admitted to adding products to the order without the customer's permission." Wolfe described this as an "event that should cause termination." Wolfe concluded the e-mail with the following statement:

> We have numerous examples of gross negligence, fraud, deceit and lack of moral character. These are not areas in which corrective action can be taken. I can merely monitor him more closely. I recommend that Dan be terminated as an employee of West Group in the near future. I also believe that everyone has a right to dignity and respect, Dan should be given the chance to resign.
>
> *I welcome any and all feedback from my fellow Managers to see if I have missed any major elements that would allow Dan to continue.* His production in [sic] needed, I like the fellow and he truly has great sales skills, unfortunately, the negative side outweighs the positives. *If I have not been open minded to an alternative that I should consider, please let me know.* I have anguished over this decision and keep on coming up with no other workable solutions.

(emphasis added). At trial, Wolfe testified that Colantino "had the final authority to make the decision to terminate Mr. Arban."

In an e-mail to Colantino, Nicolini, and Wolfe sent on the evening of December 17, Carlson noted that he "concur[red]

in [Wolfe's] summary" and added that he "believe[d] that [Wolfe's] conclusion is well-supported." At trial, Carlson explained that he believed that "Arban should be terminated from the company" as a result of "[t]he account issues; the misrepresentations of accounts to the company; the trouble to the customers; the problems exceeded the good from Dan." At trial, Nicolini also testified that he agreed with the recommendation to terminate Arban "[b]ecause of all the ongoing things that Dan Arban had done." Finally, Colantino testified that after conferring with Wolfe, Nicolini, and Ira Tiffenberg, a director of human resources for West, he decided to terminate Arban in the middle of December. Colantino testified that in the days following December 17, he communicated to Nicolini his decision to terminate Arban after the holidays. Wolfe also testified that "within a few days of the December 16 meeting" Nicolini told him that "we should go ahead and terminate after the holidays."

On December 21, Wolfe accompanied Arban on a "field ride." At trial, Wolfe testified that the "Field Ride Recap" he prepared after the field ride was "simply a review of what I saw that day with one customer" and "not a general evaluation of Mr. Arban." According to the recap, Arban received a rating of "meets expectations" in all areas. Wolfe testified that he did not "tell Arban that all the problems that were raised at the December 16 meeting were cured," nor did he tell Arban that "everything with him was in good standing." However, Arban testified that after the ride, Wolfe made the following notation at the bottom of the recap: "visited five accounts, all five accounts corrected." The handwritten comments on the form provided in the joint appendix are illegible. Arban also testified that at no point during the field ride did Wolfe indicate that he "hadn't properly followed up from the 16th." Arban stated that Wolfe told him that he was "very satisfied" and did not indicate that any action would be taken against Arban.

Early in the morning of December 23, according to his testimony, Arban awoke with "a severe amount of acid" in his

throat. Arban called his physician's office and described his condition to an associate of his physician, who called in a prescription to a pharmacy near Arban's residence. The office notes from the call state "anxiety reflux . . . wants time off work." Arban picked up the medication later that day.

On December 24, Arban contacted Joyce Van Sciver, a human resources representative for West. Arban "explained what had happened" and that he would "be needing to take some time off." Arban was told that there were no special forms needed to request an FMLA leave, but that he should contact West's disability insurance carrier. Arban also told Van Sciver that he had an appointment to see his physician on December 28. A "leave of absence form" prepared by Van Sciver on December 29 indicates that Arban's leave began on December 25, 1998. A January 19 letter to Arban from West's disability insurance carrier states that Arban's claim for short-term disability benefits was approved for the period between January 4 and January 21.

On December 28, Arban visited his physician, who provided him with a note stating that he had been treated for "severe esophagitis and stress" and adding that Arban would be "unable to work for 3wks." Arban hand-delivered medical certification forms he had received from West's disability insurance carrier to his physician's office on December 29, and Arban's physician completed the forms on January 8.

Arban notified Wolfe of his medical leave via telephone on December 28. In an e-mail to Nicolini sent that day, Wolfe stated, "I have not called Dan regarding this yet, nor have I spoke with Jim about this. I would think the first move would be to check with HR." Arban also notified Wolfe of his medical leave via e-mail on December 28. Wolfe forwarded Arban's e-mail to Nicolini shortly after it was received, with the words, "Here is a message from Dan. I would think you also have some questions. Let's talk and do the right thing."

On December 29, Arban received a telephone call from Don Owens, a sales representative, who explained that "Bob Wolfe had instructed him to get these hot lists, to get the different accounts and pending sales he could work with." Later that day, Wolfe called Arban at home. Arban testified that Wolfe "wanted to kind of follow up on Don too to make sure those sales got in, and he wanted to find out what it was that I had done and how much I had given Don so he could kind of track it."

According to Arban, Owens called again the following day "to check up with leads again." Arban testified that Wolfe also called on the afternoon of December 30. At trial, Arban described the conversation:

Q. Okay, could you describe for the jury the phone call that you had with Mr. Wolfe on the 30th?

A. He was upset. I thought that I was giving him minimal effort. He said that the few leads that I gave Don, you know, that was unacceptable, you know, as a top performer, that I would have more going than that and that I should be able to produce a much more substantial list. And he said that he really needed me to put an effort towards it – really wanted me to come up with quite a bit, you know, as much as I possibly could so again, he could make these sales number.

Q. Did he describe why it was important to be doing this at this time?

A. Well, we kind of knew – he reiterated just that it was the end of the year and that there were – there was a lot on the line for Jim Colantino and the exclusive users. There were a lot of points involved. People could win certain prizes and he wanted to make sure that everybody got as much as they could.

***

Q. Okay, I want to give you a chance to tell the jury how it ended. What happened to conclude your phone conversation with Mr. Wolfe on the 30th?

A. We were in the dialogue and Bob – you know, I explained to Bob that I felt very uncomfortable, based on the information that I knew about the FMLA and based on what Hartford had told me, I wasn't supposed to be doing any work, that any work I did could constitute jeopardizing my benefits that I would get. So I told him that I felt that he was really putting me on the spot here because I knew I wasn't supposed to be working; my doctor said I wasn't supposed to be working. And what he was requesting was more than what I had given Don initially. And he was asking me to do quite a bit more and I didn't think that was in the best interest of what I was supposed to be doing at that point. I think he said something like, you know, well, we'll see, and he slammed the phone down. The conversation was over.

According to Arban, on December 31, Owens called him at home again and stated that "Bob asked me to give you a call and see if you'd reconsider." Arban refused. On January 5, Arban received another call at home from Wolfe. Arban testified that Wolfe repeated his request that Arban provide Wolfe with "different accounts that I can work so when you come back from your leave you're ready to roll." In response, Arban "explained that, again, I was certain that would be against what I was supposed to be doing. I appreciated the effort but, you know, that was not necessary. I would handle it when I got back."

Sometime between December 31 and January 3, Colantino called Tiffenberg. Tiffenberg testified that Colantino "indicated at that time that Mr. Arban had applied for short-

term disability and wanted to know whether or not we could proceed – or he could proceed with the termination of Mr. Arban's employment." Tiffenberg consulted with West's in-house counsel, who concluded that "there were no issues in proceeding with the termination." When asked at trial whether he thought there was "any problem with terminating Mr. Arban during his leave," Tiffenberg said no, and explained that "it had no relationship to the reasons for the termination, and the termination we had made that decision prior back in mid-December before Mr. Arban even had applied for leave." However, Tiffenberg also testified that he was not "aware of any records or e-mail that documents an actual decision being ordered by Mr. Colantino."

Late in the afternoon on January 6, Arban received another telephone call from Wolfe. At trial, Arban described the conversation:

Q. All right. Go ahead. Will you describe that phone call?

A. Bob called me again and asked me to come out and meet with him, asked me to pick a spot where I thought I could drive out and meet him. And I, again, reiterated this to Bob, you know, I'm not going to be able to do this. I can't come to meet with you. He suggested coming to my house and meeting with me. I told him at this point, any work that I did I thought was a violation, and he became more and more insistent and said that it was not in violation, that I needed to do this, this was something I had to do.

\*\*\*

Q. Okay. How did the phone conversation conclude?

A. He said if I wanted – he asked me why I was unwilling to do that so I said I spoke with Hartford.

Hartford said I was not supposed to do this. He said, well, I'll see about that. He's going to call Hartford and verify or check on whether or not that was to take place – whether I could do that or not.

According to Arban, Wolfe called him again later that day.

Q. Okay, and what – go ahead. What was said to you by Mr. Wolfe at that time?

A. Whole different tone at this point. He was very upset, told me that I – he had called, spoke to Hartford. They told him, you know, supposedly from what he said that I had to do this and that I, you know, my – if not, then I was going against what was called insubordination.

\*\*\*

Q. Okay, well, go ahead. If you could just describe to the jury what was said in that phone conversation?

A. I asked Bob what was so important and why I had to come and meet with him on this particular day at this particular – you know, why I had to come and do this. They said, Dan, what I want you to do is gather all your materials. I want you to bring your computer, your laptop, and I want you to come out and meet me. We'll pick a spot and we'll meet. I said this seems kind of unusual. You don't need to have all this material to go over hot lists that you're going to manage while I'm gone. And he said, Dan, I need you to get all your – he wouldn't tell me basically what the reason was so I finally called and said, Bob, it sounds to me like you're firing me. Are you terminating me, Bob? And he said, yes.

Q. Did he make any mention about any of the materials or the computer that you had at your house?

A.  Oh yeah.  He said he wanted met you [sic] gather my computer, any hot list, any company information, anything at all that belonged to West he wanted me to gather, put in my car and meet him.

Q.  And did you – go ahead.  Can you just describe the end of the conversation?  Did you agree to do that?

A.  No.  I told him that I was certain that being on medical leave, I was not supposed to do that.  It would constitute work.  And I asked him if, you know, what was so important and why he had to do this right now.  I was simply going to be on leave for another week, why don't we just wait until the end of the week and then I'd be back to work and we could address whatever the reasons were then.

Q.  What did he say?

A.  He said no.  He said, I want you to go and meet with me. . . . And he said, well, you know, Dan if I have to, I will come to your house.  We'll do this at your house.  I'm going to have to terminate you in front of your own family.  And I was concerned about that.  I have small kids.

When asked at trial whether it "would be a violation of the policy . . . that West had, that you couldn't ask an employee to do work-related services during their leave," Wolfe responded, "If the leave were granted, yes."

At trial, Arban described the final conversation that occurred between himself and Wolfe on the evening of January 6:

Q.  Did the subject of resignation come up?

A.  No, not at this point.  What he said to me was, where do you want to meet?  I said, well Bob, I know for a fact I'm not supposed to be going far.  He said, no

problem.  I'll come to you.  Where would you like to be?  And I said I have no idea.  He said, well, we've met before at the Weber.  Why don't we use the Weber. . . . I said Fine.  I said, I'll meet you there and he said, Dan, you've got great reputation; you know, employee file.  He said, I were you, I'd be worried about protecting that, being terminated.  If you wanted to come in and offer to me a letter of resignation, I would probably accept it at that point.

On January 6, Nicolini forwarded an e-mail from Wolfe regarding Arban to Colantino.  In the e-mail, Nicolini stated, "Below are the main issues we have regarding Dan Arban." Wolfe's e-mail, which had been created earlier that same day, began by stating, "You wanted an outline of events to consider in terminating Dan Arban."  The e-mail went on to describe the allegations against Arban, including "misrepresentation concerning a new firm being started," the addition of "products to a signed contract," double billing of a customer's account, the unsolicited sending of materials to customers, and the "misrepresentation of when the trial period would start" with respect to another client.  At trial, Colantino testified that he had no idea why Nicolini had sent him this e-mail.  Colantino also stated that the decision to terminate Arban had been made before he received the e-mail.  On January 8, Arban prepared a letter of resignation, met Nicolini and Wolfe, and handed his letter to Wolfe, who read it and accepted it.

On July 14, 1999, Arban filed this lawsuit against West.  In October and November 2000, the case was tried before a jury. West timely moved for judgment as a matter of law at the close of all the evidence, which the district court denied after the jury returned a verdict in favor of plaintiff in the amount of $119,000.  On March 2, 2001, the district court entered judgment in favor of Arban in the amount of $119,000 plus $11,448.88 in interest, $85,656.73 in attorney's fees, and $8,961.87 in costs.  The district court declined to award front pay or liquidated damages. On August 23, 2001, the district

court denied West's renewed motion for judgment as a matter of law or new trial. On September 17, 2001, West filed its notice of appeal. On September 27, 2001, Arban filed his notice of appeal.

## II.

This court reviews *de novo* a district court's denial of a motion for judgment as a matter of law. *Monday v. Oullette*, 118 F.3d 1099, 1101 (6th Cir. 1997). This court does not weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury. Instead, this court views the evidence in the light most favorable to the party against whom the motion is made and gives that party the benefit of all reasonable inferences. The motion should be granted, and the district court's decision reversed, only if reasonable minds could not come to a conclusion other than one in favor of the movant. *Wehr v. Ryan's Family Steak Houses, Inc.*, 49 F.3d 1150, 1152 (6th Cir. 1995).

The FMLA entitles an eligible employee to as many as twelve weeks of leave during any twelve-month period if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id.* at § 2611(11). An employee need not specifically mention the FMLA when taking leave. All the employee must do is notify the employer that FMLA-qualifying leave is needed. 29 C.F.R. § 825.303(b).

Two distinct theories for recovery on FMLA claims exist. The "entitlement" or "interference" theory arises from § 2615(a)(1), which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter,"

and from § 2614(a)(1), which provides that "any eligible employee who takes leave . . . shall be entitled, on return from such leave (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position." The "retaliation" or "discrimination" theory arises from § 2615(a)(2), which provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."

The "entitlement" or "interference" theory is derived from the FMLA's creation of substantive rights. If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred. *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999).

> The issue is simply whether the employer provided its employee the entitlements set forth in the FMLA– for example, a twelve-week leave or reinstatement after taking a medical leave. Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer.

*Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998).

The substantive right to reinstatement provided in § 2614(a)(1), however, "shall [not] be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B). Similarly, the right to non-interference with medical leave also is not absolute. "[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA

request than he or she did before submitting that request." *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998). An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave. *Id.*

At trial, Arban argued that West denied him his substantive right to reinstatement and interfered with his substantive right to take FMLA leave. First, with respect to Arban's reinstatement claim, Arban "must establish, by a preponderance of the evidence, that he is entitled to the benefit he claims." *Rice v. Sunrise Express*, 209 F.3d 1008, 1018 (7th Cir. 2000).

> [I]f the employer claims that the employee would have been discharged . . . the employee, in order to establish the entitlement protected by § 2614(a)(1), must, in the course of establishing the right, convince the trier of fact that the contrary evidence submitted by the employer is insufficient and that the employee would not have been discharged . . . if he had not taken FMLA leave.

*Id.* Here, West presented considerable evidence that the decision to terminate Arban had been made before Arban went on medical leave, but that his actual termination had been deferred until after the holidays. While an employer has the discretion to fire an at-will employee for poor performance, at trial Arban cast doubt upon both the timing of and the reasons for the decision to terminate him. For example, the December 17 e-mail from Wolfe to Colantino suggests that no final decision had been reached. In that e-mail, Wolfe states: "I welcome any and all feedback from my fellow Managers to see if I have missed any major elements that would allow Dan to continue. . . . If I have not been open minded to an alternative that I should consider, please let me know." Arban also testified that following the "field ride" on December 21, Wolfe told Arban that he was "very satisfied."

The "Field Ride Recap" prepared after the ride also stated that Arban "meets expectations" in all areas. In addition, the jury considered an e-mail from Wolfe that Nicolini had forwarded to Colantino on January 6, which stated, "You wanted an outline of events *to consider* in terminating Dan Arban." (emphasis added). While this e-mail is open to several interpretations, the jury was entitled to conclude that West was continuing to study the matter and had not come to a final decision by January 6. As the Seventh Circuit has observed, "the timing of this decision could lead a fact finder to infer that the employee would not have been fired absent her taking of leave (if, for example, a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took leave, and the supervisor based the firing on the incidents of which the employer had already been aware)." *Kohls v. Beverly Enters. Wisconsin, Inc.*, 259 F.3d 799, 806 (7th Cir. 2001). In this case, while the evidence permitted differing inferences, sufficient evidence was presented at trial for the jury to conclude that West denied Arban his substantive right to reinstatement.

Next, with regard to his interference claim, the jury was entitled to find in Arban's favor if he presented sufficient evidence to establish that he was denied his substantive rights under the FMLA "for a reason connected with his FMLA leave." *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 961 (10th Cir. 2002). "Such a reason need not be retaliation." *Id.*; *see also Miller v. Defiance Metal Prods., Inc.*, 989 F.Supp. 945, 946 (N.D. Ohio 1997) (noting that plaintiff's termination due to absenteeism caused by a medical condition constituted "an interference under FMLA"). Twenty-nine C.F.R. § 825.220(b) also explains that "interfering with" the exercise of an employee's rights under the FMLA includes "discouraging an employee from using [FMLA] leave."

West argues that "it is undisputed that West promptly granted Arban's request for leave without any further questions" and that Arban's "allegations are, therefore,

insufficient to state a claim for interference." As support for this proposition, West cites *Dodgens v. Kent Mfg. Co.*, 955 F.Supp. 560, 564 (D.S.C. 1997). In *Dodgens*, the court found that a plaintiff employee's claim that his FMLA rights were "interfered with" when a plant manager called him twice during his medical leave and requested that he take a demotion was not cognizable under the FMLA. West's reliance on *Dodgens* is misplaced. Unlike the plaintiff in *Dodgens*, who was not asked to work while on medical leave but rather to accept a demotion upon returning to work, Arban presented evidence that he was asked to continue to perform work-related tasks while ostensibly on medical leave. Arban testified that after notifying Wolfe of his medical leave on December 28, Wolfe called him on several occasions and requested that he provide customer lists and pending sales. Moreover, Arban stated that during a January 6 conversation with Wolfe, he explained that he could not meet with Wolfe because he was on medical leave, to which Wolfe responded that "he's going to call [West's disability insurance carrier] and verify or check whether or not" Arban could meet with him. Shortly thereafter, Wolfe called Arban and told him that he had spoken with West's disability insurance carrier, which had "told him, you know, supposedly, from what he said that I had to do this [meet with Wolfe]." Arban then asked him whether he was being fired, and Wolfe responded that he was. In light of this evidence, the jury was entitled to conclude that Arban was terminated for reasons related to his FMLA leave.

As previously mentioned, in addition to the substantive guarantees provided by the act, the FMLA also affords employees protection in the event they suffer retaliation or discrimination for exercising their rights under the FMLA. Specifically, "[a]n employer is prohibited from discriminating against employees . . . who have used FMLA leave," nor can they "use the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c). This prohibition includes retaliatory discharge for taking leave. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001). These protections have been described as

proscriptive in nature. *Hodgens*, 144 F.3d at 160. If the employer is found to have retaliated against the employee for using FMLA leave, the employer is subject to a claim for compensatory damages and, unless the court finds the violation occurred in good faith, additional liquidated damages. 29 U.S.C. § 2617(a)(1)(A).

With regard to Arban's retaliatory discharge claim, there was sufficient evidence to support the jury's conclusion that West retaliated against Arban for taking leave under the FMLA. At trial, Arban testified that during the December 21 field ride Wolfe stated that he was "very satisfied" with Arban's performance. The "Field Ride Recap" prepared by Wolfe also stated that Arban "meets expectations in all areas." West does not dispute that after the field ride, Arban engaged in protected activity by taking leave pursuant to the FMLA, nor does West dispute that its termination of Arban qualifies as an adverse employment action. The evidence also supports the jury's finding of a causal link between Arban's participation in the protected activity (FMLA leave) and the adverse employment action (his termination). Although "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual," *Skrjanc*, 272 F.3d at 317, the jury weighed additional evidence, including evidence of Arban's performance appraisals and the demeanor of witnesses on the stand. Moreover, as previously discussed, Arban testified that after notifying Wolfe that he had taken medical leave, Wolfe repeatedly called Arban at home "to get different accounts and pending sales he could work with." Arban stated that Wolfe had indicated that "there was a lot on the line for Jim Colantino and the exclusive users" and that "[p]eople could win certain prizes and he wanted to make sure that everybody got as much as they could." Arban also explained that when he told Wolfe that he "wasn't supposed to be doing any work," Wolfe responded with anger. Arban added that Wolfe described Arban's failure to assist him as "insubordination." Although West argues that "Arban changed his story so that it appears that Wolfe was upset that

he would not work or meet with him during his leave," as previously explained, the jury is in a better position to judge witness credibility than the appellate court. The record thus contains evidence that supports the jury's finding that West's explanation for Arban's termination was disingenuous and that the real reason was the taking of FMLA leave.

### III.

A district court's disposition of a motion for a new trial is reviewed for an abuse of discretion. *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 n. 7 (6th Cir. 1999). This court has defined an abuse of discretion as a "definite and firm conviction that the trial court committed a clear error of judgment." *Cincinnati Ins. Co. v. Byers*, 151 F.3d 574, 578-79 (6th Cir. 1998) (quotation omitted).

West argues that it is entitled to a new trial "based upon critical errors in the jury instructions and the verdict form." Specifically, West argues that "the jury was not given any guidance whatsoever regarding what constitutes 'interference' under the FMLA." West contends that the jury improperly could have found it guilty of "interference" while at the same time "rejecting Plaintiff's arguments that he was fired *because of* his leave."

This court reviews jury instructions as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury. *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 966 (6th Cir. 1998). A party is not entitled to a new trial based upon alleged deficiencies in the jury instructions unless the instructions, taken as a whole, are misleading or give an inadequate understanding of the law. *Id.* Here, the district court's instructions to the jury state, in relevant part:

Under the Family and Medical Leave Act it is unlawful for any employer to interfere with, restrain or deny the exercise of or the attempt to exercise any right under the

Family and Medical Leave Act. It is also unlawful under the Family and Medical Leave Act for an employer to discharge or in any other manner discriminate against any other individual for opposing any practice made lawful by the Family and Medical Leave Act.

\*\*\*

In order for Plaintiff to prove that West discriminated or retaliated against him because he took leave, Plaintiff must establish the following evidence by a preponderance of the evidence.

(1)  he engaged in an activity protected by the Act;
(2)  that this exercise of his protected rights was known to the defendant;
(3)  that defendant thereafter took an employment action adverse to the plaintiff; and
(4)  that there was a causal connection between the protected activity and the adverse employment action.

To show such a causal connection [between the protected activity and the adverse employment action], Plaintiff must show that the reasons given for his termination were not the true reasons, and that the true reason for his termination was that he took a medical leave.

In this case, West claims that Plaintiff was not terminated because of his leave, but because of misconduct. In order to prevail on his retaliation claim, Plaintiff must also prove, by a preponderance of the evidence, that West's stated reason for discharging Plaintiff is not the true reason, but merely a pretext for retaliation, which means that the true reasons for his termination were not the reasons stated by West, but that Plaintiff took a medical leave.

\*\*\*

However, the plaintiff must prove by a preponderance of the evidence that he would not have been discharged had he not taken Family and Medical Leave Act leave.

Upon examination of the jury instructions, West's arguments lack merit. The trial in this matter was bifurcated, and following the liability phase the jury answered "yes" to the following question: "Did defendant West Publishing Corporation violate plaintiff Daniel Arban's rights under the Family and Medical Leave Act?" This court must presume that the jury followed the district court's instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). As previously discussed, Arban presented evidence sufficient for the jury to find in his favor under an interference theory premised upon the denial of his substantive rights under the FMLA "for a reason connected with his FMLA leave." *Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d at 961. The foregoing instructions ensured that the jury could not find West liable or award any damages unless it found that West discharged Arban for taking medical leave – a finding that also would support Arban's interference claim. Since the instructions, taken as a whole, indicate that the jury was required to find that the "true reason for [Arban's] termination was that he took a medical leave," no error has been demonstrated.

### IV.

Under the FMLA, a prevailing plaintiff is entitled to receive damages in the amount of "any wages, salary, employment benefits, or other compensation denied or lost to such employee" as a result of the adverse employment action. 29 U.S.C. § 2617(a)(1)(A)(i)(I). The FMLA also provides that "the employer . . . shall be liable . . . for equitable relief as may be appropriate." 29 U.S.C. § 2617(a)(1)(B). In this case, the district court declined to submit the issue of front pay to the jury, concluding that the FMLA "does not provide for a remedy of front pay" and adding that "there is in this case insufficient evidence for the question of front pay." Arban now argues that the district court erred "by ruling that

the FMLA cannot allow a recovery of front pay, and by not properly considering an award of front pay to Mr. Arban, at least as an alternative to reinstatement."

The issue of whether front pay is available under the FMLA is a question of law that this court reviews *de novo*. *See Gottfried v. Med. Planning Serv.*, 280 F.3d 684, 690 (6th Cir. 2002). Although this circuit has not directly considered this question,[1] other circuits have found that front pay is an equitable remedy available under the FMLA, as have at least two district courts in this circuit. *See, e.g., Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d at 965; *see also Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 503-504 (4th Cir. 2001); *Churchill v. Star Enters.*,183 F.3d 184, 193 (3d Cir. 1999); *Rogers v. AC Humko Corp.*, 56 F.Supp.2d 972, 978 (W.D. Tenn. 1999); *Bryant v. Delbar Products, Inc.*, 18 F.Supp.2d 799, 810 (M.D. Tenn. 1998). Neither the district court nor West cites any cases to the contrary. Instead, West argues that "the plain language of the statute does not contemplate any future damages as an available remedy under the FMLA, because the language clearly identifies damages in the past tense." However, West focuses solely upon the language of 29 U.S.C. § 2617(a)(1)(A)(i)(I) and ignores the language of 29 U.S.C. § 2617(a)(1)(B), which provides for equitable remedies. Although West adds that the legislative history does not contain "any discussion of, or even reference to, the availability of front pay or future damages under the FMLA," West has not identified any explicit prohibition against front pay. In light of these authorities and the FMLA's provision for equitable remedies, we find that the FMLA provides for front pay.

---

[1]In an unpublished decision concerning an FMLA claim, this court previously has held that "[t]he appropriateness of reinstatement and front pay, as equitable remedies, are within the discretion of the district court." *Taylor v. Invacare Corp.*, 64 Fed. Appx. 516, 523, 2003 WL 21212674, at *6 (6th Cir. May 21, 2003).

While the determination of the precise "amount of an award of front pay is a jury question," the initial "determination of the propriety of an award of front pay is a matter for the court." *Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 398 (6th Cir. 1993) (ADEA claim). This court reviews the district court's conclusions regarding the propriety of an award of front pay for an abuse of discretion. *See Simpson v. Ernst & Young*, 100 F.3d 436, 444 (6th Cir. 1996) (ERISA claim) ("A decision to submit the issue of front pay to the jury is committed to the sound discretion of the trial court and is reviewed on appeal for abuse of discretion.").

Although "[r]einstatement is the presumptively favored equitable remedy," it is not appropriate "where the plaintiff has found other work." *Roush*, 10 F.3d at 398. In this case, Arban testified that he accepted an offer to serve as a field sales representative for Matthew Bender, a legal publishing company, in July or August of 1999. The fact that reinstatement is inappropriate, however, does not mean that an award of front pay is required. "No per se rule governs the appropriateness of front pay damages in a particular case. . . . Ultimately, the question to be answered is whether front pay damages are needed in a particular case to make the plaintiff whole." *Wilson v. Int'l Bro. of Teamsters*, 83 F.3d 747, 756-57 (6th Cir. 1996). Several factors must be considered when determining the propriety of an award of front pay, including "an employee's duty to mitigate, the availability of employment opportunities, the period within which one by reasonable efforts may be re-employed, the employee's work and life expectancy, the discount tables to determine the present value of future damages and other factors that are pertinent on prospective damage awards." *Roush*, 10 F.3d at 399 (quoting *Shore v. Federal Express Corp.*, 777 F.2d 1155, 1160 (6th Cir. 1985)).

In this case, the district court refused to submit the issue of front pay to the jury, stating:

Number two is the Court believes that there is in this case insufficient evidence for the question of front pay even if it were allowed to go to the jury for the following reasons: Number one, is there has been really – the proofs here are that in terms of loss wages, loss opportunity, and so forth, that there's just not enough evidence to go – especially on what he has made, and I understand that part of it had to do with the law school and so forth, but still based upon his mitigation of damages which he has none, there is no reason that a reasonable jury could believe that there's going to be front pay, number one.

A review of the evidence presented at trial indicates that the district court's decision was not an abuse of discretion. Arban testified that after accepting employment with Matthew Bender in July or August of 1999, his compensation was $45,000. Arban also explained that in 2000, he became a field sales manager, a position that he agreed was "similar to the field sales manager position [he] had with West dating back to 1997." Through the first eleven months of 2000, Arban had earned $185,000, $100,000 of which was attributable to the opening of a new law school in his area. Arban's earnings as an employee of West in 1998, by contrast, were $169,412. Consequently, Arban has shown no damages warranting an award of front pay.

Arban argues that "[a] comparison of the earned wages in 1998 to the earned wages in 2000 clearly is not proper or relevant in the determination of Mr. Arban's front pay" and that "a legitimate comparison for calculating front pay is the amount Mr. Arban would have earned and the amount Mr. Arban was earning." Arban, however, did not provide evidence by which the jury could make what he claims would be a more accurate estimate of his earnings. "A plaintiff who seeks an award of front pay must provide the district court with the essential data necessary to calculate a reasonably certain front pay award." *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 862 (7th Cir. 2001); *see also Tyler v. Union Oil Co.*

*of Cal.*, 304 F.3d 379, 402 (5th Cir. 2002) (affirming district court's denial of front pay where an award would be "purely speculative").   At trial, William King, Arban's economic expert, testified as follows:

Q.  Did you come up with a number for front pay, taking the October 30 date and going forward?

A.  Certainly.

Q.  And what number did you come up with for that?

A.  One Million, Eight Hundred and Eighty-Seven Thousand, Three Hundred Eighty-Four Dollars.

Q.  Now–

THE COURT:   Hang on.  Front pay is what Mr. Arban told you?  You didn't do any research or anything else?  It's what he said that he thinks he could make or not make?

THE WITNESS:   Well, it's based on that and the Social Security Wage Index.

THE COURT:   But it's all based on what he hold you?

THE WITNESS:   Yes.  The two years at the twenty percent, and then the Social Security Wage Index.

THE COURT:   But all you did was take the Social Security formula and add it to what he told you–

THE WITNESS:   Correct.

THE COURT:   – he thinks he could have made somewhere else?

THE WITNESS:   Well, he had said he was going to go up thirty percent a year, and I would do so–

THE COURT:   But it's all based on what he told you?

THE WITNESS:   Yes.

Arban's evidence regarding front pay was purely speculative. On the evidence before it, the district court thus did not abuse its discretion in declining to submit the issue of front pay to the jury.

### V.

Arban contends that the district court erred in failing to award liquidated damages under the FMLA.  The FMLA provides that a court shall award liquidated damages equal to the damages due to lost compensation plus interest.  29 U.S.C. § 2617(a)(iii).  However, if an employer proves that it acted "in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation" of the FMLA, the court may reduce the damages. *Id.*

The FMLA does not explicitly define the term "good faith." However, this court previously has turned to the Fair Labor Standards Act (FLSA), which contains similar remedial provisions, for guidance in interpreting the FMLA.  Both the FMLA and the FLSA provide that an employer "shall" be liable for damages and liquidated damages and that the district court "may" reduce the amount of liquidated damages if good faith is established.  *See* 29 U.S.C. § 216(b) (providing damages under FLSA); *id.* at § 260 (providing good faith defense to liquidated damages under FLSA); *id.* at

§ 2617(a) (FMLA). "[T]he legislative history of the FMLA reveals that Congress intended the remedial provisions of the FMLA to mirror those in the FLSA." *Frizzell*, 154 F.3d at 644 (citing S. Rep. No. 103-3, at 35 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 37 ("[The FMLA's] enforcement scheme is modeled on the enforcement scheme of the FLSA. . . . The relief provided in FMLA also parallels the provisions of the FLSA.")).

Under the FLSA, a district court may not exercise its discretionary authority to reduce or eliminate a liquidated damages award unless the employer first sustains its burden of proving that its "failure to obey the statute was *both* in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon it more than a compensatory verdict." *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002) (quotation omitted) (FLSA context). This court thus must consider whether West sustained its burden. "Although in the final analysis, we review a district court's decision on liquidated damages for abuse of discretion, that discretion must be exercised consistently with the strong presumption under the statute in favor of doubling." *Elwell*, 276 F.3d at 840 (quotation omitted).

The district court found that West acted in good faith because "they made their decision even before the medical leave was – the Family Medical Leave Act request was even put in. They wanted to delay it because of the holidays." However, as previously noted, the district court's instructions to the jury specifically state:

> To show such a causal connection [between the protected activity and the adverse employment action], Plaintiff must show that the reasons given for his termination were not the true reasons, and that the true reason for his termination was that he took a medical leave.

In this case, West claims that Plaintiff was not terminated because of his leave, but because of misconduct. In order to prevail on his retaliation claim, Plaintiff must also prove, by a preponderance of the evidence, that West's stated reason for discharging Plaintiff is not the true reason, but merely a pretext for retaliation, which means that the true reasons for his termination were not the reasons stated by West, but that Plaintiff took a medical leave.

As previously noted, this court presumes that the jury followed the district court's instructions. *Weeks*, 528 U.S. at 234. In finding in favor of Arban, the jury thus necessarily found that West made its decision because Arban "took a medical leave," not because of Arban's misconduct. "[W]hen legal and equitable issues to be decided in the same case depend on common determinations of fact, such questions of fact are submitted to the jury, and the court in resolving the equitable issues is then bound by the jury's findings on them." *Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d at 965. In this case, the district court disregarded the jury's finding – that West's decision to fire Arban was a result of his medical leave and not his misconduct – in considering the liquidated damages issue. Instead, the district court made its own contrary finding, which served as the basis for its denial of liquidated damages. This was error. The district court thus abused its discretion when it denied Arban liquidated damages.

## VI.

In its April 26, 2001, order, the district court granted West's motion for stay of execution of the judgment "pending the disposition of post-trial motions and, if necessary, during appeal." Arban now argues that for West to obtain a stay of execution of the judgment, West must give a supersedeas bond pursuant to Fed. R. Civ. P. 62(d). This court reviews a district court's denial of a supersedeas bond for an abuse of

discretion.  *Kennedy v. Uniroyal Pension Plan*, 937 F.2d 608, 1991 WL 134613, at **8 (6th Cir. 1991) (unpublished).

Rule 62(d) entitles a party who files a satisfactory supersedeas bond to a stay of money judgment as a matter of right.  *Federal Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980) (citing *Am. Mfr. Mut. Ins. Co. v. Am. Broad. Paramount Theatres, Inc.*, 385 U.S. 931 (1966)).  However, "the Rule in no way necessarily implies that filing a bond is the only way to obtain a stay.  It speaks only to stays granted as a matter of right, it does not speak to stays granted by the court in accordance with its discretion." *Id.*  Arban claims that West must make "at least a showing that it has adequate resources to satisfy the bond."  West has done so here.  At the hearing on West's motion for stay without bond on April 25, 2001, counsel for West stated that "the revenues of the group of which West is a part is approximately 2.5 billion."  The Seventh Circuit has noted that "an inflexible requirement of a bond would be inappropriate . . . where the defendant's ability to pay the judgment is so plain that the cost of the bond would be a waste of money." *Olympia Equip. Leasing Co. v. Western Union Tel. Co.*, 786 F.2d 794, 796 (7th Cir. 1986).  In light of the vast disparity between the amount of the judgment in this case and the annual revenue of the group of which West is a part, the district court's decision to grant a stay without a bond was not an abuse of discretion.

## VII.

For all of the foregoing reasons, we affirm the district court's denial of West's motion for judgment as a matter of law or for a new trial, reverse and remand the trial court's denial of an award of liquidated damages, affirm the district court's denial of Arban's claim for front pay, and affirm the district court's grant of a stay without bond.