NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0481n.06

Case No. 18-2444

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 13, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KEVIN LABELLE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| CLEVELAND CLIFFS, INC., | ) | MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | **OPINION** |
| | ) | |

BEFORE: ROGERS, GRIFFIN, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. After working for about a decade as a quality-control lab technician at Cleveland Cliffs, Inc.'s mining operation in Michigan, Kevin LaBelle was fired. LaBelle claims that, by firing him, Cliffs interfered with, and retaliated against him for, his use of the Family and Medical Leave Act ("FMLA"), under which LaBelle was entitled to intermittent leave because of severe shoulder pain. Cliffs argues that it terminated him not for *use* of leave, but for *abuse* of leave: LaBelle repeatedly stacked his FMLA leave with scheduled vacation days and at least twice used his FMLA leave to play golf. LaBelle agrees that he did these things. But he argues that this does not constitute abuse. So LaBelle sued Cliffs, bringing claims for interference and retaliation under the FMLA and violation of Michigan's Persons with Disabilities Civil Rights Act. The district court merged the interference and retaliation claims under the

retaliation framework and then dismissed the remaining two claims on summary judgment. We affirm.

I.

Kevin LaBelle worked as a quality-control lab technician at Cleveland Cliffs' northern Michigan mining company from 2007 to 2017. His job required him to pour and weigh mined materials. That meant he made repetitious motions while standing with his arms outstretched in front of him, sometimes up to twelve hours a day.

LaBelle has avascular necrosis—disruption of blood flow to the bones that causes bone deterioration—which leads to "severe wearing and deformation of the joint." (DE 19-2, Ex. 1, LaBelle Aff., Page ID 230.) At first, it affected his hips, and in 2012 he had both hips replaced. A few years later, the issue reached his shoulders. Thus, LaBelle suffers "constant pain" in his shoulders as well as more concentrated "shooting pain" that "feels like almost part of [his] bicep muscle is almost kind of pulling off." (DE 14-1, Ex. A, Arbitration Tr., Page ID 79.) LaBelle contends that his shoulder pain is exacerbated by "anything that is kind of arms up for a long period of time." (*Id.*) For example, he can no longer use a snowblower without triggering pain.

In 2016, LaBelle received two "counseling and correction notices" for absenteeism at work. (DE 14-1, Ex. A, Arbitration Tr., Page ID 66.) During the second counseling session, LaBelle explained that "the missed days were due to [his] shoulder pain" and Cliffs' management responded that he should "check into getting FMLA." (DE 16-5, Ex. E, LaBelle Statement, Page ID 181.) LaBelle therefore applied for intermittent FMLA leave in May 2016. Cliffs, however, denied the request. In its denial, Cliffs explained that it could not grant FMLA leave because the information LaBelle provided did not show that he was incapacitated for more than three calendar days at a time or that he had a chronic condition that required treatment at least twice a year.

In August, using a different certifying doctor, LaBelle reapplied for intermittent FMLA leave. His doctor wrote that LaBelle "intermittently will have exacerbations that limit work" and that it was medically necessary for LaBelle to miss work during "flare-ups," which would occur about once a month for three-day periods. (DE 15-5, Ex. E, FMLA Request, Page ID 150–51.) Cliffs approved the request. It notified LaBelle that he was entitled to FMLA leave for up to four medical appointments per year and for monthly flare-ups, which could last up to three days per episode. The letter noted that LaBelle's FMLA leave was "limited to the condition specified in [his] certification" and that "[i]mproper use or abuse of intermittent leave is grounds for discipline, up to and including termination." (DE 15-6, Ex. F, Letter, Page ID 154.)

Over the next year, Cliffs "detect[ed] a suspicious pattern" in LaBelle's use of FMLA leave: LaBelle repeatedly combined his FMLA days with scheduled days off and vacation days. (DE 14-1, Ex. A, Arbitration Tr., Page ID 67.) For example, in March 2017, LaBelle used three FMLA days (March 22-24) in between scheduled days off and vacation days (March 21 and March 25-April 5). Similarly, in June 2017, after using a combination of sick days, vacation days, and scheduled days off (June 7-18), LaBelle used FMLA leave (June 19-21).

Suspicious that LaBelle was abusing his FMLA leave, Cliffs hired a private investigator to surveil LaBelle twice when he took FMLA leave—June 20 and July 11—both Tuesdays, when his golf league played. Both times, the investigator recorded LaBelle playing golf. Cliffs manager Troy Sarles watched the surveillance videos and determined that "LaBelle's golf game appeared unimpaired" as "[h]e moved without hesitation and his golf swing was both smooth and powerful" and he golfed "without any sign of distress or discomfort." (DE 16, Troy Aff., Page ID 156–57.)

After reviewing the surveillance material, Cliffs notified LaBelle that it suspected he was engaged in fraud and abuse of FMLA. Cliffs allowed LaBelle to request a hearing in which he

could explain his behavior and potentially avoid discipline. Meanwhile, the company placed him on "administrative, paid leave pending the outcome of the investigatory hearing." (*Id.* at 157.)

On August 3, LaBelle attended the hearing. First, he addressed the suspicious pattern of combining FMLA days with other days off, explaining that because his "shoulders hurt every day, [he] was of the understanding these days were available for [him] to use at a time of [his] choosing" and that he "often attached them to a weekend in order to receive the most time for relief from the repetitious work that creates the pain." (DE 16-5, Ex. E, LaBelle Statement, Page ID 181.) Second, he addressed the golf issue. LaBelle explained that "[g]olfing is much less aggravating than the full shift of repetitious work required by working in the lab." (*Id.*) LaBelle later expounded that "long sustained periods of repetitive motions creates way more pain than just a quick swing" because "80 percent of your swing is legs and core," rather than shoulder action. (DE 14-1, Arbitration Tr., Page ID 80.) In his affidavit, LaBelle similarly attested that he could "golf freely without causing any issue to [his] condition," as golfing did not cause pain that his work's "repetitive and stationary motion" created. (DE 19-2, LaBelle Aff., Page ID 230.)

Following the hearing, Cliffs' management convened. They "agreed that if Mr. LaBelle was experiencing a shoulder flare-up that prevented him from working, he would not be able to golf and that if he could golf, he could work." (DE 16, Troy Aff., Page ID 158.) So on August 15, they fired him. In his termination letter, they wrote they fired him because of "fraud and abuse of FMLA leave due to intentionally misleading the company regarding [his] absences." (DE 16-6, Termination Letter, Page ID 183.) Cliffs further noted that it was "unable to conclude that [LaBelle's] absences from work on June 19-21 and July 11-12 were medically necessary" because "[t]here [was] no evidence to suggest that [LaBelle was] suffering from a flare-up on either occasion or even that [he] had been working so much [he] needed a break." (*Id.* at 184.)

The next day, LaBelle filed a grievance. He claimed that Cliffs wrongfully discharged him without just cause.[1]  On November 8, LaBelle and Cliffs entered arbitration; the arbitrator found that Cliffs had just cause to terminate LaBelle and denied his grievance. In his opinion, the arbitrator concluded that LaBelle "routinely used his leave time to cover days off when he was able to work, which constituted misuse." (DE 16-7, Arbitration Op., Page ID 194–95.)  He noted that "[i]n making that assessment, what may have tipped the balance was [LaBelle's] use of FMLA leave time to play golf" as "[t]his is simply not consistent with a claimed inability to work or, even under [LaBelle's] explanation, a need to rest his shoulders from the rigors of his job." (*Id*. at 195.) Thus, the arbitrator found, "the Company had just cause for discharge." (*Id.*)

LaBelle disagreed. He filed a three-count complaint in the Western District of Michigan. He alleged that the company: (1) interfered with his right to take leave under the FMLA by consistently following him and seeking to fire him without good cause; (2) discriminated or retaliated against him for using FMLA leave by terminating him; and (3) violated the Michigan Persons with Disabilities Civil Rights Act by terminating him because of his use of leave. To show Cliffs' discriminatory animus, LaBelle pointed to internal communications among management. For example, in an email chain from May 11, 2017, in response to a request for the spreadsheet documenting LaBelle's absences, Area Manager Scott Rasmussen wrote: "Does this mean that you're actually discussing this hot potato?" (DE 19-10, Email, Page ID 260.)  In another internal email, Rasmussen wrote that he had "[b]een keeping an eye on a few of [their] folks and mapping out their absences" and that he would "dearly love to get at least one of these slackers."

---

[1] Not challenged on appeal, LaBelle also claimed that Cliffs improperly denied him "Justice and Dignity."  The Arbitrator agreed with LaBelle, writing that LaBelle was "not guilty of fraud because he received profit-sharing payments that included FMLA time" and that LaBelle therefore "was improperly denied Justice and Dignity."  DE 16-7, Arbitration Op., Page ID 194.  LaBelle does not raise this issue on appeal.

(DE 19-9, Email, Page ID 246.)  Thus, LaBelle contended that Cliffs "wanted to terminate [him] based on his disability and his use of FMLA leave."  (DE 1, Compl., Page ID 3.)

After conducting some discovery, Cliffs filed a motion for summary judgment in May 2018.  The district court granted it in full.  First, the district court found that "[w]hile LaBelle has presented his interference and retaliation claims as stand-alone causes of action, it is apparent to the Court that the essence of his claim is retaliation, not interference with substantive FMLA rights, so his FMLA claims should be merged and analyzed under the retaliation framework."  (DE 36, Op. and Order, Page ID 299 (internal quotation marks and citation omitted).)  Thus, the district court declined to analyze LaBelle's claims under the interference framework.  Applying the *McDonnell-Douglas* burden-shifting framework to the retaliation claim, the district court found that although LaBelle established a prima facie case of FMLA retaliation, Cliffs articulated a legitimate and nondiscriminatory reason for terminating LaBelle: fraud and abuse of FMLA leave. The district court then determined that because LaBelle did not demonstrate that Cliffs' justification was pretextual, Cliffs was entitled to summary judgment on the FMLA claim.  Last, the district court decided that LaBelle's state-law claim failed for the same reason.  Thus, the district court dismissed the case with prejudice.  LaBelle timely appealed the district court's dismissal of the federal law claims.

## II.

This court reviews de novo a district court's grant of summary judgment.  *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 281 (6th Cir. 2012).  Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (citing Fed. R. Civ. P. 56(c)).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party," *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986), and a fact is "deemed material only if it might affect the outcome of the lawsuit under the governing substantive law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015). In considering a motion for summary judgment, this court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," and draws all reasonable inferences in favor of the nonmoving party. *Nat'l Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997). Thus, "[t]he central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Sommer v. Davis*, 317 F.3d 686, 690 (6th Cir. 2003) (internal citations omitted).

III.

On appeal, LaBelle raises three arguments. First, he contends that the district court erred when it merged his interference and retaliation claims under the FMLA. Second and third, respectively, he argues that the district court erred in granting summary judgment for Cliffs on the interference and retaliation claims under the FMLA. LaBelle does not challenge the district court's disposition of the state-law claim. We find LaBelle's arguments unpersuasive and affirm the district court's grant of summary judgment for Cliffs.

A.

The FMLA entitles an employee with a "serious health condition that makes the employee unable to perform the functions" of his position to twelve weeks of leave per year, which can be taken intermittently or on a reduced leave schedule. 29 U.S.C. §§ 2612(a)(1)(D), (b)(1). Upon returning from FMLA leave, the employer must reinstate the employee to his position or an equivalent position with regard to pay, benefits, and other conditions of employment. *Id.* § 2614(a)(1)(A)–(B). The Act prohibits an employer from interfering with an entitled employee's

use of FMLA leave (interference or entitlement theory), *see id.* § 2615(a)(1), or retaliating against an employee who exercises his rights under the Act (retaliation or discrimination theory), *see id.* § 2615(a)(2). The Act provides a private cause of action for aggrieved employees. *Id.* § 2617(a)(1).

1.

LaBelle argues that the district court erred when it merged LaBelle's interference and retaliation claims and evaluated them under only the retaliation framework. In explaining the merger, the district court wrote that "[w]hile LaBelle has presented his interference and retaliation claims as stand-alone causes of action, it is apparent to the Court that the essence of his claim is retaliation, not interference with substantive FMLA rights." (DE 36, Op. and Order, Page ID 299 (internal quotation marks and citation omitted).) LaBelle contends that the district court should have independently analyzed the interference claim, as Cliffs interfered with his right to FMLA leave by being "hostile toward [him] when he would call in for his FMLA leave[,]" making "it very clear that it did not approve of LaBelle's taking the intermittent leave in question," and ultimately terminating his employment. (CA6 R. 14, Appellant Br., at 19.) We disagree.

Under the interference theory, an employer violates the FMLA when it "interfere[s] with, restrain[s], or den[ies] the exercise of or the attempt to exercise" FMLA rights. 29 U.S.C. § 2615(a)(1). To prevail on an interference claim, an employee must prove: (1) he was an FLMA-eligible employee, (2) the defendant was an "employer" as defined under the FMLA, (3) he was entitled to FMLA leave, (4) he gave the employer notice of his intention to take leave, and (5) the employer denied the employee FMLA benefits to which he was entitled. *Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014). Thus, "[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA—for example, a twelve-week leave or

reinstatement after taking a medical leave." *Arban v. West Publ'g Corp*, 345 F.3d 390, 401 (6th Cir. 2003) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998)). LaBelle does not dispute that he received all the FMLA leave he requested. His claim, then, is not one of interference.

But several internal company emails show hostility toward his use of leave, he argues, which "made it very clear that [Cliffs] did not approve of" what he did. Although Cliffs might have been hostile, internally, to LaBelle's use of leave, there is no evidence that he saw these emails during his employment or that they otherwise "affected or otherwise interfered with [his] FMLA use." (CA6 R. 16, Appellee Br., at 13.) So even if the emails suggest frustration with LaBelle's absences, they do not show any interference with, or denial of, LaBelle's entitled leave.

Alternatively, LaBelle contends that Cliffs interfered with his FMLA rights by ultimately terminating his employment. But in *Seeger*, this court explained that it is proper to confine analysis to the retaliation framework when the aggrieved employee receives all FMLA leave to which he is entitled and is terminated after he returns from leave. 681 F.3d at 283 (analyzing interference and retaliation claims under only the retaliation framework). For example, in *Seeger*, this court limited its analysis to the retaliation theory when the employee received all the FMLA leave to which he was entitled, resumed his normal work routine after taking leave, and then was terminated three weeks later. *See id.* In doing so, this court looked to the Eighth Circuit's decision in *Stallings*, when the court found that the employee's claim was "fundamentally a claim for retaliation and should be analyzed as such" where the employer granted the employee's requests to take FMLA leave, did not "impede[]" the employee's use of FMLA leave, and "only after [the employee] returned from FMLA leave . . . question[ed] whether [he] fraudulently used his FMLA leave and fire[d] [him]." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006). Given that

LaBelle received all the FMLA leave he requested and was terminated afterward for suspected fraud, the district court correctly found that "the essence" of LaBelle's claim is retaliation, not interference. (CA6 R. 36, Op. and Order, Page ID 299 (quoting *Seeger*, 681 F.3d at 282).) Thus, the district court properly merged the two claims under the retaliation framework.

2.

LaBelle argues that the district court erred when "it failed to find that [Cliffs] retaliated against [him] for taking leave under the FMLA." (CA6 R. 14, Appellant Br., at 27.) The district court granted summary judgment for Cliffs on the retaliation claim after finding that LaBelle "has not proffered evidence from which a reasonable juror could conclude that Cliffs bore a discriminatory animus towards him for his *use* of FMLA leave; the only rational conclusion that can be drawn from the evidence is that Cliffs discharged LaBelle for his *abuse* of the FMLA system." (DE 36, Op. and Order, Page ID 304.) We agree that Cliffs is entitled to summary judgment on the retaliation claim and therefore affirm.

Under the retaliation theory, an employer is prohibited from "discriminating against employees[,]" which includes "retaliatory discharge for taking leave." *Marshall v. The Rawlings Co.*, 854 F.3d 368, 376 (6th Cir. 2017) (quoting *Arban*, 345 F.3d at 403). When an FMLA retaliation claim is based on indirect evidence, the *McDonnell-Douglas* burden-shifting analysis applies. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) ("This court applies the familiar burden-shifting test articulated in *McDonnell Douglas* . . . to retaliation claims under the FMLA."); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (establishing the analytical framework for discrimination claims under Title VII). First, LaBelle must establish a prima facie case of retaliation under the FMLA by showing that (1) he engaged in a statutorily protected activity; (2) Cliffs knew that he was exercising his FMLA rights; (3) he suffered an

adverse employment action; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Seeger*, 681 F.3d at 284. At this stage, the burden of proof is "minimal," as all LaBelle must do is "put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Id.* at 283 (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). If LaBelle establishes a prima facie case, he raises a presumption of discrimination. *Id.* at 285. The burden then shifts to Cliffs to articulate a nondiscriminatory basis for the adverse action and thus rebut the presumption. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012).

If Cliffs articulates a nondiscriminatory reason for its actions, the burden shifts back to LaBelle to show that Cliffs' justification is pretext for retaliation. *Seeger*, 681 F.3d at 285. LaBelle may show pretext by showing that the proffered reason (1) had no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to warrant the action. *Id.* On appeal, the parties agree that whether LaBelle gets to a jury depends on whether he can create a genuine dispute over pretext. He seeks to take solely the first route, arguing that Cliffs' proffered reason had no basis in fact; that is, that he did not abuse his FMLA leave. LaBelle does not argue that he possibly abused his FMLA leave but that this abuse "did not actually motivate" his termination or that his abuse could not warrant termination.

There is no evidence in the record to show that Cliffs' proffered reason lacked a basis in fact. Cliffs approved LaBelle's request for intermittent FMLA leave for two reasons: (1) attending medical appointments and (2) taking three days off per month for a "flare-up." Even crediting LaBelle's explanation of why it was ok for him to golf, or why he "stacked" his leave, LaBelle did not take FMLA leave for "flare-ups" or medical appointments. He took FMLA leave because he was in constant pain and would take leave around vacations or weekends to give himself as much

11

rest as possible.  But occasional rest to alleviate low-level background pain is not what his FMLA leave was for.  Thus, as the arbitrator put it, "[t]here is no doubt that [LaBelle] did not use his FMLA leave in accordance with the restrictions imposed by [his doctor], or in accordance with the purposes of the law."  (DE 16-7, Arbitration Op., Page ID 192.)  If LaBelle had constant pain that required occasional long weekends to mitigate, he should have requested FMLA leave for that purpose.

Both LaBelle and Cliffs spend much of their time on appeal arguing about whether Cliffs had an "honest belief" that LaBelle abused his FMLA leave.  When an employee shows pretext through the first route—that the proffered reason for his termination had no basis in fact—the employer can respond by demonstrating that it nevertheless had an "honest belief" in the factual basis for the employee's termination.  *See Seeger*, 681 F.3d at 285.  If, for example, LaBelle had put forth evidence showing that he did not abuse his FMLA leave, Cliffs could respond by arguing that it honestly believed LaBelle abused his FMLA leave.  Here, however, there is no need to inquire into Cliffs' "honest belief," because LaBelle did not show that Cliffs' proffered reason had no basis in fact.

* * *

We affirm the district court's judgment.