*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0069p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

WILLIAM T. MOORER,

              *Plaintiff-Appellee/*
              *Cross-Appellant,*

        *v.*

BAPTIST MEMORIAL HEALTH CARE SYSTEM;
BAPTIST MEMORIAL HEALTH CARE CORPORATION
(03-5855/5965); CATHY M. HILL; JOHN N. ROBBINS
(03-5855),

              *Defendants-Appellants/*
              *Cross-Appellees.*

Nos. 03-5855/5965

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 99-02043—Bernice B. Donald, District Judge.

Argued: September 15, 2004

Decided and Filed: February 11, 2005

Before: BOGGS, Chief Judge; CLAY, Circuit Judge; HAYNES, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Paul E. Prather, KIESEWETTER WISE KAPLAN SCHWIMMER & PRATHER, Memphis, Tennessee, for Appellants. Justin S. Gilbert, THE GILBERT FIRM, Jackson, Tennessee, for Appellee. **ON BRIEF:** Paul E. Prather, Tanja L. Thompson, KIESEWETTER WISE KAPLAN SCHWIMMER & PRATHER, Memphis, Tennessee, for Appellants. Justin S. Gilbert, THE GILBERT FIRM, Jackson, Tennessee, J. Houston Gordon, LAW OFFICE OF J. HOUSTON GORDON, Covington, Tennessee, for Appellee.

    CLAY, J., delivered the opinion of the court, in which HAYNES, D. J., joined. BOGGS, J. (p. 19), delivered a separate opinion concurring in part and dissenting in part.

_____

[*]The Honorable William J. Haynes, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

—————————

**OPINION**

—————————

CLAY, Circuit Judge.  Defendants Baptist Memorial Health Care System and Baptist Memorial Health Care Corporation (collectively "Baptist") appeal the June 3, 2003 judgment of the district court in favor of Plaintiff William "Tate" Moorer on his claim for discriminatory discharge in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12117 ("ADA"). Baptist asserts that the district court erred in finding that it regarded Moorer as disabled and that it discharged Moorer because of his perceived disability.  Baptist also challenges the district court's award of $250,000 to Moorer as compensatory damages for emotional distress.  Moorer cross-appeals the district court's earlier grant of summary judgment in favor of Baptist on his claim under the Family Medial Leave Act,  29 U.S.C. § 2601-2654 ("FMLA").  For the reasons that follow, we **AFFIRM** the judgment in favor of Moorer on his ADA claim, but **REVERSE** the order granting summary judgment in favor of Baptist on Moorer's FMLA claim.

**I.**
*Background*

**A.  Substantive Facts**

Plaintiff William "Tate" Moorer worked for Defendants Baptist Memorial Health Care System and Baptist Memorial Health Care Corporation for 17 years prior to his termination in 1997. Over the years, Moorer enjoyed a series of promotions, culminating in 1995, when Baptist promoted him to Administrator and Chief Financial Officer of Tipton County Baptist Hospital ("BMH-Tipton") and Lauderdale Baptist Hospital ("BMH-Lauderdale").  Moorer was the only administrator in the Baptist system who had responsibilities for two hospitals.  His responsibilities included the day-to-day operation of the hospitals; the physical condition and safety of the hospitals; quality of patient care; the development of medical staff; the annual budgetary process and financial results; the leasing of space to physicians and collecting rent from them; and legal compliance.  Starting in 1995, Moorer reported directly to Steve Mansfield, Chief Executive Officer for Baptist's regional hospitals.

On January 27, 1997, Mansfield and his direct supervisor, John Robbins, Baptist's Executive Vice President, met with Moorer to discuss a list of performance concerns set forth in a performance evaluation dated January 26, 1997.  Approximately two weeks later, Moorer responded orally with a "plan of action" to address the concerns, and Mansfield and Robbins agreed to it.

In April 1997, Mansfield assumed a new role as the CEO of Baptist East, a hospital in Memphis, Tennessee.  His job duties were divided among several people, each of whom assumed the new job title of "market leader."  On May 12, 1997, Cathy Hill became the market leader for all of the hospitals and physician practices in the West Tennessee market, and assumed responsibility for supervising Moorer.  In transferring his West Tennessee duties to Hill, Mansfield met with Hill and gave her the January 26, 1997 performance evaluation that he had prepared for Moorer. Mansfield told Hill that Moorer had made progress in some areas, but not others, and that Hill should follow up on those areas of continuing concern.

On June 9, 1997, Hill met with Moorer and discussed the January 26, 1997 performance evaluation.  She asked Moorer for "his feedback regarding that memo and where he was, where he saw himself in relation to those issues identified," and she asked for "his plan for corrective action." Hill told Moorer to put his feedback in written form and that it would be for "[her] eyes only."  On June 16, 1997, Moorer faxed the requested memo to Hill, which Hill acknowledged receiving.

Hill and Moorer met on July 9, 1997 to discuss Moorer's June 16, 1997 memorandum. Hill promised to provide Moorer with a list of goals that he was to accomplish, and Moorer agreed to meet those goals. On July 21, 1997, Hill prepared a draft memorandum containing performance goals, but never gave it to Moorer. That memorandum acknowledged that Moorer had made efforts to correct certain performance deficiencies, but added that he needed to improve his overall job performance and that failure to do so by September 15, 1997 might result in his termination.

On July 22, 1997, Hill was attending a meeting of the West Tennessee Baptist Health Services Group Board, a meeting that Moorer also attended. Hill was standing in a corridor, outside of the meeting room, when she greeted Moorer and thought she perceived the smell of alcohol on his breath. At trial, Hill described the interaction as follows:

> Quite frankly, as I had thought about this, you know, Mr. Moorer had told me in his – in his letter that he sent me that he had sleepless nights worrying about some of these performance issues. So at that particular night,…I felt that Mr. Moorer was too smart and knew – had worked for Baptist too long to know that – to know better than to come to a meeting, but I wasn't sure if the performance issues were causing an alcohol [sic] or if there was an alcohol performance issue, I didn't know.

During the meeting, Hill observed Moorer slump in his chair with his chin on his chest, and then straighten up and be "rather fidgety" in his seat. She also noticed that his complexion appeared ruddy. Moorer denies that he had been drinking alcohol, and instead explains that, after smoking cigarettes, he had washed his mouth out with Listerine just prior to the meeting. He attributed his fatigue and his ruddy complexion to the tropical vacation from which he had recently returned.

Hill did not confront Moorer about her perception of alcohol on his breath, but instead, two days later, told Robbins about the incident. About a week after that, Hill, Robbins, and Larry Braughton, Senior Vice President of Human Resources, discussed the issue. Braughton recommended that Hill contact "CONCERN," which is Baptist's Employee Assistance Program. Hill followed this suggestion and contacted Patrick Minderman, Director of CONCERN, during the first week of August 1997. She told Minderman that "there was a high level administrator in the Baptist system that [ sic] she was concerned about because of his work performance problems." Hill called Minderman again, possibly a week or two later, indicating that she was still concerned about this employee and provided more detailed information. During that call, she identified Moorer by name, telling Minderman that Moorer had been having performance problems for the last year and mentioned that Moorer had shown up at a meeting with alcohol on his breath.

On August 6, 1997, Hill sent an e-mail to Robbins and Braughton concerning Moorer as a follow-up to the conference the previous week. The e-mail stated, in part:

> I have made the contact recommended, had confidential discussions and was given the following recommendation:
>
> 1. Act Swiftly… Our resource[1] agrees with our assessment of high likely hood [sic] that the pivot incident[2] is good indicator of broader, lon[g] term issue.
> 2. Discuss performance issues and as a SIDE part of that concern, make management referral giving individual small amount of time to make decision and first interview. Do not use the observation 2 weeks ago as primary emphasis.

---

[1] The "resource" mentioned in the e-mail was Minderman.

[2] The phrase "pivot incident" refers to the July 22, 1997 incident in which Hill perceived a smell of alcohol on Moorer's breath.

3.  Plan on minimum of 3-4 weeks of leave for the individual.
4.  Plan to terminate if refuses to act on management recommendation.

The e-mail concluded with a "[b]ack up plan[]" to cover for Moorer during his leave "until we get a better idea of long term situation."

Hill testified that "Mr. Minderman had given us the specific recommendations regarding how to handle Mr. Moorer's situation." At trial, however, Minderman denied telling Hill that Moorer had an alcohol problem or making a recommendation that Moorer might need to be terminated. He also did not recall telling Hill that the July 22 incident in which Hill smelled alcohol on Moorer's breath was a "good indicator of [a] broader, long-term issue"; he further denied that such an incident would be a good indicator of a broader, longer-term issue. In fact, Minderman had no assessment of Moorer's condition as of August 6, 1997. He flatly denied telling Hill that Moorer should be placed on leave for treatment  or that Hill should plan a leave for him.

On August 12, 1997, Hill, Robbins, and Braughton discussed Hill's August 6, 1997 e-mail and agreed to it as the appropriate plan of action. Collectively, they decided to refer Moorer to the CONCERN program for a fitness for duty evaluation. With input from Braughton, Robbins, and legal counsel, Hill prepared a letter to Moorer that outlined alleged performance deficiencies and goals that Moorer was expected to meet. The letter was a revision of the draft letter Hill had prepared on July 22, 1997 but never gave to him. The letter noted, in part, "While I find that you have made efforts to correct the noted deficiencies and have made some improvements in some areas, there is a lack of substantial progress toward elimination of root causes and thus, limited improvements in your overall job performance and the desired outcomes in the operations at the two facilities you administer." These purported deficiencies included inconsistent financial reporting; past due accounts receivable; improper management of a physician's contract; lack of effort to educate his staff regarding revised budget processes; customer satisfaction issues; and symptoms of drunkenness exhibited at the July 22, 1997 meeting. The letter continued, "I have made a management referral to Concern, EAP, for fitness assessment and any resulting plan of action. This is a mandatory action and your failure to participate and cooperate by 10 am, August 20, 1997 will result in your immediate termination."

The letter further instructed Moorer "to refrain from ANY contact with ANY hospital personnel" until Robbins and Hill had "full clarification of issues and recommendations" from the fitness assessment. It also set out "additional action plans and goals" for Moorer and warned that "[f]ailure to 100% successfully adhere to or complete" them would be "a basis for immediate additional disciplinary actions up to and including termination." Contrary to the no-contact instruction, however, some of these goals required contact with hospital personnel, including revising the BMH-Tipton's strategic plan, which would give Moorer "the opportunity to personally interact with all levels of staff." *Id.* The strategic plan was required to be submitted by August 27, 1997.

Robbins and Hill met with Moorer on August 19, 1997 and presented Moorer with the letter. During the meeting, Hill told Moorer that she had a family history of alcoholism and told Hill that she thought he was an alcoholic. Hill and Robbins then assured Moorer that he would have a job when he returned from alcohol rehabilitation.

To avoid termination, Moorer agreed to have an evaluation the next morning with John Houlihan of CONCERN. He met with Houlihan, who diagnosed Moore with "chemical abuse" and recommended treatment at the Anchor Hospital/Talbott Recovery Center. On August 22, 1997, Moorer flew to the recovery center in Atlanta. He was scheduled for five weeks of treatment and stayed the full five weeks.

On August 28, 1997, while Moorer was at the recovery center, Hill telephoned Moorer's wife at home and said, "I know an awful lot about alcoholism and alcoholics." She told Mrs. Moorer that her father was an alcoholic, as was her brother, who had killed himself. She also said that "alcoholism is an incurable disease and your husband will never be cured, and it is a deadly disease."[3]

On August 21, 1997, Dr. Jesse Cannon, Chief of the Medical Staff at BMH-Tipton, sent a letter to the President of Baptist, with copies to Hill and Moorer, as well as to Anita Vantries of the Tennessee Health Care Facilities Commission ("THFC"), the state licensing agency for hospitals. Cannon's letter forwarded a list of problems and deficiencies at the hospital that had come to light over the past three to five years and attached complaints of other physicians as well. Cannon attributed these problems to management's requirement that the system must "decrease cost at all cost." The problems included the decision of Moorer to close restroom facilities in the south doctor's office building because a patient had sued the hospital after slipping on the wet floor; the poor maintenance of the hospital's facilities and unsanitary conditions; leaking ceilings (including in the operating rooms); a fire hazard in an operating room due to a lack of storage space for supplies; too few nurses; and shortages of supplies. Hill confirmed many of these complaints through her own investigation and was required to spend $200,000 to address them.

Other issues purportedly came to Hill's attention in this time-frame. First, Hill could not locate the leases signed by the physicians for the office space in the physician office buildings at BMH-Tipton; she also allegedly learned via verbal reports from Joe Hunsucker, an internal auditor, that physicians were obtaining medical supplies and pharmaceuticals from the hospital, as well as using labor from the hospital's business office, without compensating the hospital. Second, Hill received complaints from employees at BMH-Tipton about certain employee relations issues, including an accusation that Moorer did not respect employees, especially women, and the results of a survey showing that employees had rated the administrative leadership below national norms. Third, on September 2, 1997, Hill learned about high accounts receivable balances for the hospitals that Moorer managed, apparently due to a backlog of claims and an inordinately high error rate in claims processing. Fourth, during the first week of September, 1997, Hill discovered that certain home health care employees on the home health agency payroll actually were working at the hospital, raising the potential of fraud because Medicare provides a larger reimbursement for home health care workers who work for the agency as opposed to the hospital.

Between August 19, 1997 and September 12, 1997, Hill had regular contact with Robbins regarding Moorer. She recommended that Moorer not be permitted to come back to work at BMH-Tipton because of his performance problems. Robbins took Hill's recommendation under advisement, and later decided to terminate Moorer because he had lost confidence in Moorer's ability to run an independent facility. According to Hill, the decision to terminate Moorer's employment was made during the week prior to September 12, 1997.

Robbins and Braughton developed a script with the human resources department that Hill was to follow when terminating Moorer's employment. After consulting with Houlihan at CONCERN and with Moorer's therapist, Braughton determined that it would be best to relay the termination decision in person and that the most therapeutically appropriate day to relay this information was September 18, 1997. Robbins and Hill traveled to Atlanta on that day and met with Moorer and his primary therapist. Hill read primarily from the termination script. Moorer recalls little from the meeting except that Hill told him that his work problems were caused by his disease.

---

[3] At trial, Hill confirmed that she had personal family experiences that caused her to be interested in alcoholism. She explained that both her father and brother had abused alcohol, and her brother committed suicide after a long battle to cope with a brain injury he had suffered in an alcohol-related automobile accident. According to Hill, her personal experience enabled her to have a "greater insight" into alcoholism.

Moorer completed the five-week treatment period, but his doctors recommended that he remain in treatment for a few additional weeks. Moorer elected to leave the treatment program against medical advice. Moorer admits he is an alcoholic, but testified that he has not had a drink since August 22, 1997.

## B.        Procedural History

Moorer brought suit against Baptist, alleging that Baptist discharged Moorer in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12117 ("ADA"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 ("ADEA"), the Family Medial Leave Act, 29 U.S.C. § 2601-2654 ("FMLA"), and the Tennessee Human Rights Act, TENN. CODE ANN. § 4-21-101 *et seq.*, the Tennessee Handicap Act, TENN. CODE ANN. § 8-50-103, and that Baptist committed the tort of tortious misrepresentation. On February 22, 2000, the district court granted summary judgment in favor of Baptist on Moorer's state law claims for tortious misrepresentation and for violation of the Tennessee Handicap Act and the Tennessee Human Rights Act on statute of limitations grounds. The court also granted summary judgment to Baptist on Moorer's FMLA claim on the ground that Moorer had presented no evidence of a causal connection between his termination and his use of FMLA leave. The court further held that Moorer had no substantive right to return to his job after his leave because his "termination does not appear to have been due to his use of FMLA leave, but rather to other factors (*i.e.*, deficient performance according to Baptist or age and disability discrimination according to Moorer)." Finally, the court denied Baptist's motion for summary judgment as to Moorer's ADA and ADEA claims finding genuine issues of material fact for trial.

After a bench trial on Moorer's ADA and ADEA claims, the district court concluded that Baptist violated the ADA, but not the ADEA. The district court found that Moorer did not suffer an actual disability, nor did he have a record of a disability. Instead, the court focused on the theory that Baptist regarded him as having a disability. The court cited to the following evidence to support its conclusion that Baptist linked Moorer's alleged performance deficiencies to a belief that he was an alcoholic: (1) Baptist demanded that Moorer undertake a fitness for duty examination; (2) on August 19, 1997, Hill told Moorer that she thought he was an alcoholic and required him to seek treatment; (3) while Moorer was undergoing treatment, Hill called Moorer's wife and told her that alcoholism is an incurable disease and, therefore, Moorer would never be cured; and (4) when Hill fired Moorer, she told him that his work-related problems were caused by his disease of alcoholism.

Finding Hill's testimony "lacking in credibility" and to be of "no value," the court rejected Hill's assertion that she relied solely on Moorer's poor work performance in requiring him to have treatment and then recommending his termination. Rather, the court found "that Hill acted in accord with her belief that Plaintiff's deficiencies were related to his alcoholism."

The court next found that Hill believed Moorer's alcoholism to substantially limit the major life activity of working. The court noted that Moorer's job duties were diverse, requiring general skills that could be used in a broad range of fields. The court found that the "skills required of Plaintiff as a hospital administrator are easily identified as necessary for most high-level management positions," regardless of field. Therefore, the court concluded that it did not need "quantitative evidence that his impairment precluded him from a certain number of jobs in the relevant market." Further, the court found that "since Hill believed that Plaintiff's alcoholism substantially limited his ability to work at Baptist, she must also have recognized that such an impairment would have precluded him from performing a broad class of jobs."

Last, the court found that Baptist's articulated reasons for terminating Moorer "were identified only after Hill had already concluded that Plaintiff's alcoholism prevented him from

working; as such, they are pretext, regardless of their alleged validity." (citing *Maddox v. Univ. of Tenn.*, 62 F.3d 843, 888 (6th Cir. 1995)).  As the court summarized in its accompanying order:

> Plaintiff's supervisor Cathy Hill perceived Plaintiff as an alcoholic and  perceived that alcoholism precluded him from competently performing his job.  Based on this perception, Defendant regarded Plaintiff as disabled and used subsequently discovered evidence of Plaintiff's deficiencies to justify her unlawful basis for his discharge.

After a subsequent hearing on damages, the court ordered a back pay award of $425,553.61, plus $16,787.86 in pre-judgment interest on the back pay.  The court also awarded $250,000 in compensatory damages for Moorer's emotional distress, plus $17,732.72 in prejudgment interest.  The court cited to evidence of Moorer's sleep deprivation, anxiety, and the fact that the reason for his termination, alleged alcoholism, became public knowledge in his small community.  The court also awarded $124,260.45 in front pay because reinstatement was not an option.  The court declined to award punitive damages.  Separately, the court awarded Moorer's counsel $212,060.34 in attorneys' fees and costs.

Judgment was entered on June 3, 2003, and Baptist filed its notice of appeal on June 27, 2003.  Moorer filed a notice of appeal of the order granting summary judgment in favor of Baptist on his FMLA claim and the judgment in favor of Baptist on his ADEA claim.  On appeal, Moorer has not raised any argument concerning his ADEA claim, so he has waived this issue on appeal.

## II.
### *ADA Claim*

### A.    Standard of Review

On the appeal of the bench trial of an ADA claim, we review the district court's findings of fact for clear error.  *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 331 (6th Cir. 2002) (citing *Burzynski v. Cohen,* 264 F.3d 611, 616 (6th Cir. 2001); *AM Intern., Inc. v. Int'l Forging Equip. Corp.,* 982 F.2d 989, 998 (6th Cir. 1993);  FED. R. CIV. P. 52(a)).  "'This standard does not entitle a reviewing court to reverse a district court's findings of fact because the reviewing court is convinced it would have decided the case differently.'"  *Id.* (quoting *Equal Employment Opportunity Comm'n v. Yenkin-Majestic Paint Corp.,* 112 F.3d 831, 833 (6th Cir. 1996)).  "[W]here there are two permissible ways to view the evidence, the district court's decision to view the evidence in one of those ways as opposed to the other cannot be clear error."  *Id.* (citing *Yenkin-Majestic* (citing *Anderson v. City of Bessemer City,* 470 U.S. 564, 573-74 (1985))).  We review the district court's conclusions of law *de novo.  Id.* (citing *Burzynski,* 264 F.3d at 616).

### B.    Analysis

The ADA prohibits "covered entities," like Baptist, from discriminating against "a qualified individual with a disability because of the disability of such individual."  42 U.S.C. § 12112(a).  Unlawful discrimination includes firing an individual because of his disability.  *Id.* § 12112(a).  "The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  *Id.* § 12111(8).  Under the ADA, a "disability" means either (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment.  42 U.S.C. §  12102(2).

According to the ADA regulations, a major life activity means "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and

working."  29 C.F.R. § 1630.2(i).  "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs" or "'a broad range of jobs in various classes.'"  *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491 (1999) (quoting 29 C.F.R. § 1630.2(j)(3)(i)).  "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."  29 C.F.R. § 1630.2(j)(3)(i).

### 1.      Moorer's disability status under the "regarded as" definition

The first issue is whether the district court correctly found Moorer to be disabled within the meaning of the ADA.  The district court found that Baptist "regarded" Moorer as having a physical or mental impairment – alcoholism[4] – that substantially limited his ability to work, and, therefore, Moorer satisfied the third definition of disability set forth at 42 U.S.C. § 12102(2).  According to the Supreme Court:

> There are two apparent ways in which individuals may fall within this statutory definition:  (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.  In both cases, it is necessary that a covered entity entertain misperceptions about the individual – it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

*Sutton,* 527 U.S. at 489.  The district court reached its conclusion by breaking its analysis into two parts:  first, whether Baptist regarded Moorer as having a physical or mental impairment, and second, whether Baptist mistakenly regarded that impairment as substantially limiting the major life activity of working, when it was not.  Each part of the analysis is discussed below.

The district court did not commit clear error when it concluded that Baptist believed Moorer had the physical or mental impairment of alcoholism.  After perceiving what she believed to be alcohol on Moorer's breath on July 22, 1997, Hill, Moorer's supervisor, told her superiors via an August 6, 1997 e-mail that Moore's apparent intoxication was a "good indicator of [a] broader, lon[g] term issue," and she recommended a minimum 3-4 weeks of leave for him.  After obtaining her superiors' approval, Hill demanded that Moorer undertake a fitness for duty examination or else face immediate termination.  Later, Hill told Moorer that she thought he was an alcoholic and also called Moorer's wife and told her that alcoholism is an incurable, deadly disease and that Moorer would never be cured.  When Hill fired Moorer, she told him that his work-related problems were caused by his disease of alcoholism.

This evidence was more than sufficient for the district court to conclude that Baptist, via Hill, perceived Moorer to be an alcoholic as early as July 22, 1997.  It was within the province of the district court, as the finder of fact, to reject Hill's explanation  that she relied solely on Moorer's poor work performance in requiring him to have treatment and then recommending his termination on the ground that her explanation was "lacking in credibility" and of "no value."

The more significant issue is whether Baptist perceived Moorer's alcoholism as a substantial limitation on his ability to work, which, as noted above, requires a showing that Baptist perceived him as unable to work in a broad class of jobs or a broad range of jobs in various classes. Baptist argues that the district court erred in finding that Baptist regarded Moorer as significantly limited

---

[4]"There is no question that alcoholism is an impairment … under the ADA."  *Bailey v. Georgia-Pacific Corp.*, 306 F.3d 1162, 1167 (1st Cir. 2002) (collecting cases).

in his ability to perform even his particular job as a hospital administrator, let alone, his ability to perform a broad class or range of jobs.  We disagree.

There was substantial evidence that Hill linked her perception of Moorer's alcoholism to his inability to perform his job as a hospital administrator.  The August 19, 1997 memo that Hill sent to Moorer referred to his "failure to meet the expectations normally associated with the hospital administrative responsibilities in BHCC."  Hill further stated, "While I find that you have made efforts to correct the noted deficiencies and have made some improvements in some areas, there is a lack of substantial progress toward elimination of *root causes*…." (emphasis added).  Hill then listed several examples of these deficiencies and added, "In an effort to utilize all available resources to evaluate these performance issues, I have made a management referral to Concern, EAP, for fitness assessment and any resulting plan of action."  The implication of Hill's memo was that she believed that a "root cause[]" of Moorer's performance problems might be uncovered through his referral to CONCERN for his perceived alcohol problem.  Consistently, Moorer testified that, at the time Hill informed him of the termination, she told him that she believed his performance problems were caused by his "disease."

Based on this evidence, the court did not clearly err in finding that "Hill acted in accord with her belief that Plaintiff's deficiencies were related to his alcoholism."  Because Hill came to the conclusion that Moorer could not perform the duties of a hospital administrator, and because Hill linked his poor performance to his alcoholism, it was reasonable for the district court to conclude that Hill regarded Moorer as having an impairment that substantially limited his ability to perform his job.

Still, it does not follow from these findings that Moorer was entitled to a favorable judgment on his ADA claim.  "[T]o be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job."  *Murphy v. United Parcel Serv.*, 527 U.S. 516, 523 (1999).  Moorer was required to show that Baptist regarded him as unable to work in a broad class of jobs or a broad range of jobs in various classes.  This is no easy task.

In *Ross v. Campbell Soup Co.*, 237 F.3d 701 (6th Cir. 2001), this Court recognized that "[p]roving that an employee is regarded as disabled in the major life activity of working takes a plaintiff to the farthest reaches of the ADA" and that this question is "embedded almost entirely in the employer's subjective state of mind."  *Id.* at 709.  This task is "extraordinarily difficult" because "it is safe to assume employers do not regularly consider the panoply of other jobs their employees could perform, and certainly do not often create direct evidence of such considerations."  *Id.*  The Court therefore held that "where there is substantial evidence that an individual's medical status played a significant role in an employer's decision to fire that individual, combined with evidence that the employer concocted a pretextual justification for that firing, the need for more extensive factual inquiry" – *i.e.*, by a trier of fact – "into whether the employer engaged in unlawful discrimination is especially acute."  *Id.*  Therefore, "evidence that the company created a pretextual reason for [the plaintiff's] firing may tend to prove that it regarded [the plaintiff] as a disabled employee."  *Id.* at 708.  As discussed below, application of the *Ross* principles to the facts of this case tends to prove that Baptist regarded Moorer as disabled.

### a.      Role of alcoholism in Moorer's discharge

As noted above, there is substantial evidence that Moorer's medical status played a significant role in Baptist's decision to fire him.  Prior to Hill's perception of alcohol on Moorer's breath, and her ensuing suspicion that he was an alcoholic, Moorer's termination was not imminent.  Once Hill regarded Moorer as an alcoholic, however, she recommended, prior to any medical evaluation of Moorer, that he take an extended leave of absence for rehabilitation of his alcoholism.  During that leave Hill purportedly uncovered additional performance deficiencies that led to

Moorer's termination while he was still on leave. Hill told Moorer that his alcoholism was the cause of his performance problems. Accordingly, there is substantial evidence that Moorer's medical status played a significant role in Baptist's decision to fire him. *Ross*, 237 F.3d at 709.

### b. Pretextual justifications for Moorer's discharge

The district court found substantial evidence in the record that Baptist concocted pretextual justifications for Moorer's termination. First, Hill testified that Moorer's termination was based, in part, on a written report from the state fire marshal's office purportedly stating that there was a fire hazard at BMH-Tipton. Hill claims that she reviewed this report prior to Moorer's termination. It was stipulated at trial, however, that following a search, the fire marshal's office "was unable to find any record that such an inspection occurred." The only two written reports of fire safety inspections in the record indicate that the fire marshal conducted inspections on September 30, 1997 and December 4, 1997, *after* Moorer's termination. Baptist acknowledges the lack of a written report that pre-dates Moorer's termination, but explains that the record is replete with evidence that the fire hazards themselves existed prior to Moorer' termination. This explanation, however, does not explain away Hill's testimony that she relied on a *written report* of fire hazards.

Second, Hill testified that Moorer's termination was based, in part, on inspections of the BMH-Tipton facility conducted by the Tennessee Health Facilities Commission prior to the date of Moorer's termination, September 18, 1997. She claimed that "[a]uthorized representatives" of the Commission reported numerous issues concerning deficiencies at the facility. Hill testified that these reports were in writing and "were on the corner of" Moorer's desk and that she reviewed them prior to terminating him. Although the Commission did conduct a survey of BMH-Tipton, the survey was not conducted until September 30, 1997, *after* Moorer's termination.

Baptist has no persuasive response to this inconsistency, other than to point out that Hill had spoken with inspectors prior to Moorer's termination. This argument, however, does not explain away Hill's testimony that Moorer's termination was based in part on *written* reports from the Commission, reports she could not have received until after the termination decision was made. Baptist also argues that "Hill unequivocally testified at trial that she spoke with surveyors from the Commission about deficiencies at the hospital prior to September 18[, 1997]." *Baptist's Reply Br.* at 21 (citing J.A. 594). However, the cited portion of the record does not support this assertion. Indeed, Hill admitted at trial that the survey itself was conducted on September 30, 1997, twelve days after Moorer's termination. (J.A. 585-87.) Thus, on this record, it is unclear how Hill could have had conversations with surveyors prior to Moorer's termination.

Third, Hill claimed that her termination recommendation was based, in part, on the August 21, 1997 letter from Dr. Cannon. However, Moorer's name is not mentioned in the body of the letter, and Dr. Cannon testified that the letter was not intended to be a criticism of Moorer's local administration of BMH-Tipton, but was "directed at the system at large." Dr. Cannon further testified that Hill never spoke to him about this letter prior to the date of Moorer's discharge.

Baptist counters that the issues raised in Dr. Cannon's letter were not necessarily corporate issues, but involved the condition and maintenance of the hospital, issues that were Moorer's responsibilities. Baptist adds that Hill and others had a meeting with staff members of BMH-Tipton, including Dr. Cannon, a few days after receiving Dr. Cannon's August 21, 1997 letter. It was within the province of the district court, however, as the finder of fact, to credit Dr. Cannon's testimony over Baptist's explanation.

In addition to disputing several of the specific grounds Hill cited for his termination, Moorer argues that he was selected for termination before Hill discovered the depth of Moorer's performance problems while he was on medical leave. Moorer's wife testified that after she told Joe

Swaim, a member of the BMH-Tipton board of directors, that Moorer's bosses had just visited him at the Talbot Recovery Center and fired him, Swaim responded, "I know all about it. They told us all about it before they ever sent him." Swaim denied making this statement and stated that he was never told in advance that Moorer was going to be fired. Baptist explains that the statement Mrs. Moorer attributed to Swaim "could have referred to the fact that he knew there was a problem and that Moorer would be away from the facility, rather than that Moorer would be terminated." *Baptist's Reply Br.* at 23 n.20. Although Baptist's characterization of Swain's statement is plausible, it is not the only reasonable interpretation. The district court, as factfinder, was entitled to infer from this statement that Swaim knew that Moorer would be terminated prior to Moorer's admission to the Talbot Recovery Center. This inference tends to undermine Baptist's assertion that subsequently discovered problems with Moorer's performance led to his termination.

### c.       Regarded as unable to perform a class of jobs or a broad range of jobs

The above-described evidence, which suggests that Moorer's alcoholism played a significant role in his discharge and that several of Baptist's reasons for terminating Moorer were pretextual, *tended* to prove that Baptist regarded him as disabled, *Ross*, 237 F.3d at 708; however, it was not sufficient in itself to prove that Baptist regarded him as substantially limited in his ability to work. Rather, Moorer still needed to proffer evidence showing that Baptist regarded him as unable to perform a broad range or class of jobs, meaning that Baptist perceived him as unable to perform the same general type of work in the same geographic area. *See Henderson v. Ardco, Inc.*, 247 F.3d 645, 652, 653 n.5, 654 (6th Cir. 2001) (noting in ADA "regarded as" case that it would be plaintiff's burden at trial to prove that she was perceived as "substantially impaired" in her ability to perform other employment suitable to her age, education and experience and available in her geographic area); *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 254 (6th Cir. 2000) (looking to the EEOC regulations for guidance on the meaning of a substantial limitation on the ability to perform either a class of jobs or a broad range of jobs in various classes, and noting that a court may consider "'the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs)'") (emphasis omitted; quoting 29 C.F.R. § 1630.2(j)(3)(ii)(B)).

The *Henderson* case illustrates the type of evidence Moorer needed to submit. In *Henderson*, a welder on an assembly line injured her back and was restricted from stooping or bending and from lifting 25 pounds frequently or 40 pounds infrequently. *Henderson*, 247 F.3d at 647. Company policy prohibited an employee from returning to work unless he or she was "100% healed." *Id.* The company's plant manager testified that there would not be one job at the plant that the plaintiff's medical restrictions would not "bump into." *Id.* at 651.

This Court found that one reasonable reading of the plant manager's view "is that he considers someone with physical restrictions unable to 'make it' doing factory work, even if it is within the technical requirements of the worker's restrictions, and/or that he considers it too risky or problematic to employ workers with whom he has to be cautious not to push much beyond the essential functions of their job." *Id.* The Court then held that there was a genuine issue of material fact as to whether the employer perceived the plaintiff to be substantially limited in her ability to perform a larger class of jobs because the "100% healed rule" effectively treated her as "incapable of work in a manufacturing operation." *Id.* at 651-52. In other words, the employer's perception about the plaintiff's ability to perform any work at that plant also constituted competent evidence of the employer's perception about the plaintiff's ability to perform the same broad class of work anywhere else. *See id.* at 654 ("Plaintiff has brought forward evidence that the defendant perceived there was no job for her at the Ardco plant, and this gives an indication of the employer's perception about her suitability for a class of relevantly similar employment.").

We hold that, like the plaintiff in *Henderson*, Moorer presented evidence showing that Baptist perceived him as incapable of performing a broad class of work by virtue of Baptist's perception of Moorer's inability to perform managerial work for Baptist. The district court found that Moorer's job duties were diverse, requiring general skills that could be used in a broad range of fields.[5] The court noted that the "skills required of Plaintiff as a hospital administrator are easily identified as necessary for most high-level management positions," regardless of field. According to the court, because "Hill believed that Plaintiff's alcoholism substantially limited his ability to work at Baptist, she must also have recognized that such an impairment would have precluded him from performing a broad class of jobs."

Consistent with *Henderson*, the district court essentially found that Baptist perceived Moorer as unable to perform any job that would be appropriate for him given his training, knowledge, skills and abilities. The fact that Baptist believed that Moorer's alcoholism made him unable to perform his hospital administrator job, which required a broad range of managerial skills, permits the reasonable inference that Baptist believed that Moorer's alcoholism rendered him incapable of performing a substantial number of managerial jobs. This inference is buttressed by Hill's apparent belief, which she developed before she had any substantiation of Moorer's alcoholism, that Moorer had a drinking problem that in the short-term would preclude him from working at all for four weeks and that in the long-term would kill him. Indeed, Hill's belief that Moorer's incurable alcoholism would inevitably result in his death permitted the inference that Hill regarded Moorer as substantially limited in his ability to perform any life activity at all, let alone the major life activity of working. *Cf. Heyman v. Queens Village Comm. for Mental Health for Jamaica Comm. Adolescent Program, Inc.*, 198 F.3d 68, 73 (2d Cir. 1999) (reversing grant of summary judgment for employer because a reasonable trier of fact could conclude that defendants regarded the plaintiff as suffering from a physical impairment (lymphoma) that significantly restricted his ability to work; concluding that jury might find that defendants' experience of having allowed another employee with lymphoma to continue working and his resulting inability to perform all of his duties led defendants to conclude that the plaintiff, afflicted with the same disease, would likewise be unable to function fully and soon would become a workplace liability). Accordingly, we hold that the district court did not commit clear error when it found that Baptist regarded Moorer as disabled when it terminated him.

### 2.      Causal connection between Moorer's perceived disability and his termination

We further hold that the district court did not clearly err in finding that Moorer satisfied his ultimate burden of proving that Baptist terminated Moorer "because of" his perceived disability. 42 U.S.C. § 12112(a). As noted above, there was significant evidence that at least some of the reasons for Moorer's termination were pretextual. *See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1185-86 (6th Cir. 1996) (holding that the plaintiff's burden in an ADA case is to prove that the employer's explanation is a pretext for unlawful discrimination). There also was significant evidence that Moorer's alcoholism, which Baptist erroneously perceived to be a substantially limiting impairment, actually motivated his termination.

We disagree with Baptist's contention that the district court failed to require Moorer to satisfy his burden of showing pretext. The district court made its pretext findings primarily in its discussion of whether Baptist regarded Moorer as disabled, which, in light of *Ross*, was proper. The

---

[5]The court found that "Plaintiff's general responsibilities at Baptist included planning hospital affairs, coordinating reporting requirements between different departments, directing human resource programs, serving as a liaison between staff and management, ensuring regulatory compliance, coordinating the budget process, facilitating a positive work environment, ensuring the proper level and mix of services, coordinating risk management, creating continuing education programs, and spearheading cost-saving techniques."

district court then relied on those findings to support its conclusion that Moorer was fired because of his disability.  For these reasons, we affirm the district court's finding of disability discrimination.

## III.
### *Compensatory Damages*

**A.     Standard of Review**

A trial court's finding of fact on the issue of compensatory damages "is not reversible error 'unless it manifests plain injustice, or is so grossly excessive as to be clearly erroneous.'"  *Turic v. Holland Hospitality, Inc.,* 85 F.3d 1211, 1215 (6th Cir. 1996) (quoting *Meyers v. City of Cincinnati,* 14 F.3d 1115, 1119 (6th Cir. 1994); *Anderson v. City of Bessemer City,* 470 U.S. 564, 573 (1985)).

**B.     Analysis**

Baptist requests a remittitur of the district court's award of $250,000 in emotional distress damages, claiming that the award was excessive and disproportionate to the injury that Moorer allegedly sustained as a result of his unlawful termination.  We hold that the award was not so grossly excessive as to be clearly erroneous.

[D]amages for mental and emotional distress will not be presumed, and must be proven by 'competent evidence.'"  *Turic*, *supra*, 85 F.3d at 1215  (quoting *Carey v. Piphus,* 435 U.S. 247, 263-64 & n.20 (1978); citing *Rodgers v. Fisher Body Div., Gen. Motors Corp.,* 739 F.2d 1102 (6th Cir. 1984)).[6]  However, emotional injury may be proved without medical support. *Id.* (citing *Moody v. Pepsi-Cola Metro. Bottling Co.,* 915 F.2d 201, 210 (6th Cir. 1990); *Williams v. Trans World Airlines,* 660 F.2d 1267, 1273 (8th Cir. 1981)).  "A plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden in this regard." *Id.* (citing *Meyers*, *supra*, 14 F.3d at 1119).

Moorer's own testimony, combined with that of his wife and his treating physician, constituted competent evidence of Moorer's severe emotional distress stemming from his termination.  Moorer testified that his termination had a "devastating" impact on his life and made him "depressed."  To deal with the psychic blow, Moorer sought treatment from a clinical psychologist, Dr. Dennis Wilson.  Moorer's wife testified that he has been suffering from depression, he isolates himself, and he has insomnia. Dr. Wilson testified that Moorer's termination was devastating, causing feelings of betrayal, anger and depression, as well as a significant loss of self-esteem because Moorer's self-worth "was completely tied up in his professional life."  Dr. Wilson further testified that Moorer's marriage suffered, his anxiety increased, and he was experiencing "excessive thoughts."  The district court found that Moorer's termination for alcoholism was humiliating because it became public knowledge in his small community.

In addition to this ample evidence of severe emotional distress, we also note that the compensatory damages award was less than half of Moorer's award of economic damages.  In light of the extremely deferential standard of review, there is no basis to hold that the district court's award of $250,000 to Moorer for emotional distress was grossly excessive. *Cf. Lilley v. BTM Corp.*, 958 F.2d 746, 754 (6th Cir. 1992) (holding that $350,000 mental anguish award for age discrimination was within the realm of other verdicts that have been upheld in similar cases) (citations omitted); *Miller v. Alldata Corp.*, 14 Fed. Appx. 457, 467 (6th Cir. July 6, 2001)

---

[6]Although *Turic* was a Title VII case, we assume that the same standard applies to emotional distress damages under the ADA because the statutory authorization for compensatory damages under the ADA and Title VII derives from the same source.  *See* 42 U.S.C. § 1981a(a).

(affirming district court's denial of motion for remittitur of $300,000 award for emotional distress where the plaintiff recovered only $16,000 in economic damages for gender discrimination claim). Accordingly, we affirm the award.

**IV.**
*FMLA Claim*

**A.  Standard of Review**

This Court reviews *de novo* a district court's decision to grant summary judgment. *Cockrel v. Shelby County Sch. Dist.,* 270 F.3d 1036, 1048 (6th Cir.2001). Summary judgment must be granted if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute over a material fact is only a "genuine issue" if a reasonable jury could find for the nonmoving party on that issue. *Cockrel,* 270 F.3d at 1048 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). In reviewing the district court's grant of summary judgment, this Court must view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

**B.  Analysis**

The FMLA entitles an eligible employee to take up to a total of 12 workweeks of leave during any 12-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). " The term 'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves… inpatient care in a hospital, hospice, or residential medical care facility." *Id.* § 2611(11)(A). An eligible employee who takes FMLA leave is entitled, on return from such leave, "to be restored by the employer to the position of employment held by the employee when the leave commenced" or "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id.* § 2614(a)(1). In addition to providing substantive rights to leave and reinstatement, the FMLA makes it unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. *Id.* § 2615(a)(1). The FMLA also prohibits retaliation and discrimination against employees for opposing unlawful practices under the FMLA or for filing an FMLA charge or participating in a proceeding or inquiry related to the FMLA. *Id.* § 2615(a)(2), (b).

Count VI of Moorer's complaint alleges that Baptist denied him the substantive right to return to the position that he had held before checking into the Talbott Recovery Center, in violation of the FMLA. As this Court has explained:

> If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred. *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir.1999). The issue is simply whether the employer provided its employee the entitlements set forth in the FMLA – for example, a twelve-week leave or reinstatement after taking a medical leave. Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer. *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 159 (1st Cir.1998).

*Arban v. West Pub. Corp.,* 345 F.3d 390, 401 (6th Cir. 2003). Moorer's initial burden is to "'establish, by a preponderance of the evidence, that he is entitled to the benefit he claims.'" *Id.* (quoting *Rice v. Sunrise Express,* 209 F.3d 1008, 1018 (7th Cir.2000)).

### 1.       Whether Moorer was entitled to reinstatement

Baptist has not disputed that Moorer was an "eligible employee" under the FMLA. Therefore, we assume that Moorer worked for Baptist for at least 12 months prior to his leave and had worked at least 1,250 hours during the previous 12 months. 29 U.S.C. § 2611(2) (defining "eligible employee"). Further, Baptist conceded for purposes of summary judgment that Moorer had a serious health condition and that his leave for an in-patient stay at the Talbott Recovery Center was an FMLA qualifying reason. *See id.* § 2611(11) (defining "serious health condition" to include a physical or mental condition that involves inpatient care at a hospital or residential medical facility).

In a single sentence in a footnote of its summary judgment motion, Baptist further asserted that Moorer never requested or discussed FMLA leave with Baptist. To the extent this footnote was an argument that Moorer failed to provide Baptist with sufficient notice of FMLA leave, we find the argument waived on appeal because of the perfunctory manner in which the argument was presented below. *See Noble v. Chrysler Motors Corp., Jeep Div.*, 32 F.3d 997, 1002 (6th Cir. 1994) (holding that an observation in a footnote in a brief filed in the district court was insufficient to preserve argument concerning that issue on appeal). In any event, the argument is meritless for the reasons discussed below.

Because Moorer's leave was for a serious health condition, the FMLA required him to "make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer, subject to the approval of the health care provider of" Moorer.   29 U.S.C. § 2612(e)(2)(A). Baptist has not argued that Moorer failed to comply with this requirement, nor can it. The evidence shows that Baptist fully anticipated and approved Moorer's lengthy treatment at the Talbott Recovery Center.

Moorer also was required to provide Baptist with not less than 30 days' notice, before the date the leave was to begin, of his intention to take leave for a serious health condition, except that if the date of the treatment required leave to begin in less than 30 days, Moorer was required to provide such notice as was "practicable." *Id.* § 2612(e)(2)(B). The chronology of events in this case suggests that there were far less than 30 days between the date that Moorer knew he would have to take an extended medical leave and the date he actually departed for that leave. Hill's August 6, 1997 e-mail suggests that she anticipated that Moorer would need to take at least a three to four week leave in order to treat his alcoholism. Hill met with Moorer on August 19, 1997 and presented Moorer with a letter outlining his purported performance deficiencies, notifying Moorer that Hill had referred him to the employee assistance program ("EAP") for a "fitness assessment and any resulting plan of action," and threatening Moorer with termination if he failed to meet with the EAP counselor on August 20, 1997. Hill also assured Moorer that he would have a job when he returned from alcohol rehabilitation, further indicating that Hill anticipated Moorer having to take an extended medical leave. Moorer met with the counselor on August 20, 1997, who recommended treatment at the Talbott Recovery Center. On August 22, 1997, Moorer flew to the recovery center and stayed for five weeks of treatment. These facts strongly suggest that Moorer had only two days' notice of his extended medical leave, and, therefore, he was required to provide Baptist with "practicable" notice only.

The facts clearly show that Moorer provided Baptist with "practicable" notice of his impending FMLA leave. The FMLA does not require an employee to mention the FMLA by name when notifying an employer of FMLA leave. *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998). Rather, "'[t]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.'" *Id.* (quoting *Manuel v. Westlake Polymers Corp.,* 66 F.3d 758, 764 (5th Cir. 1995)). Here, Baptist obviously knew of Moorer's anticipated leave to treat his serious health condition of alcoholism and that Moorer would be on leave for weeks because Baptist demanded that Moorer

participate in the employee assistance program and follow through on the recommended course of treatment. Baptist can hardly complain about lack of notice of Moorer's leave.

### 2.    Whether Moorer was denied reinstatement for reasons unrelated to his taking of FMLA leave

Although Moorer had a substantive right to reinstatement upon the completion of his treatment at the recovery center, that right was not absolute. "'[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting that request.'" *Arban*, 345 F.3d at 401 (quoting *Gunnell v. Utah Valley State Coll.,* 152 F.3d 1253, 1262 (10th Cir.1998)). "An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Id.* (citing *Gunnell*, *supra*). Thus, "'if the employer claims that the employee would have been discharged ... the employee, in order to establish the entitlement protected by § 2614(a)(1), must, in the course of establishing the right, convince the trier of fact that the contrary evidence submitted by the employer is insufficient and that the employee would not have been discharged ... if he had not taken FMLA leave.'" *Id.* (quoting *Rice*, *supra*).

We hold that there is a genuine issue of material fact as to whether Moorer's dismissal would have occurred regardless of his taking of FMLA leave. The decision in *Arban*, *supra*, is instructive. There, the employer, West, presented considerable evidence that the decision to terminate the plaintiff, Arban, had been made before Arban went on medical leave, but that his actual termination had been deferred until after the holidays. *Arban*, 345 F.3d at 401. The Court observed that, at trial, "Arban cast doubt upon both the timing of and the reasons for the decision to terminate him." *Id.* The Court quoted a Seventh Circuit case which held that "'the timing of this decision could lead a fact finder to infer that the employee would not have been fired absent her taking of leave (if, for example, a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took leave, and the supervisor based the firing on the incidents of which the employer had already been aware)." *Id.* at 402 (quoting *Kohls v. Beverly Enters. Wis., Inc.,* 259 F.3d 799, 806 (7th Cir. 2001)). Because the evidence in *Arban* permitted "differing inferences" about the timing and reasons for his termination, the Court held that "sufficient evidence was presented at trial for the jury to conclude that West denied Arban his substantive right to reinstatement." *Id.*

As in *Arban*, there was significant evidence in the record casting doubt upon the reasons for Baptist's decision to terminate Moorer. Indeed, this evidence prompted the district court to deny summary judgment in favor of Baptist on Moorer's ADA and ADEA claims. This evidence included the following:

● *Evidence that Baptist perceived and considered Moorer's alcoholism well before Baptist claims it knew about it.* Even though Moorer had not yet been medically evaluated, on August 6, 1997, Hill sent an e-mail to Robbins and Braughton indicating that Moore's apparent intoxication during a meeting on July 22, 1997 was a "good indicator of [a] broader, lon[g] term issue" and recommending a minimum 3-4 weeks of leave for him. The district court remarked, "[I]t defies basic logic that a reasonable and rational person could determine that a man needs to be placed on leave in a rehabilitation program for at least 3-4 weeks based upon a single observation of a single incident which, at worst, would only indicate that Moorer had been drinking only on that occasion."

● *Evidence that Hill had dissembled when she claimed that her recommendation to terminate Moorer was based in part on a State of Tennessee Heath Care Facilities*

*Commission Report and on an alleged failure of the Tipton hospital to pass a State of Tennessee Fire Marshal's inspection.* Evidence in the summary judgment record indicated that the State of Tennessee had not conducted these inspections prior to Moorer's termination. The district court remarked, "This apparent misrepresentation by Hill… raises the most serious questions in the mind of the court."

- *Evidence that the performance-related reasons for Moorer's discharge were undermined by the affidavit of Dr. Cannon, who stated that his complaints concerning management were not directed at Moorer.*

- *Evidence that the hospitals had "superb profits" during Moorer's tenure as administrator, as opposed to previous years.*

The record also shows that Baptist was aware of many of Moorer's alleged performance deficiencies prior to his FMLA leave, thereby casting doubt on the timing of the purported reasons for his termination. The January 26, 1997 memorandum from Moorer's former supervisor discussed many of the same performance deficiencies Baptist now cites to justify his termination, including customer complaints, FTE management, physician contract issues, and staff communication. Yet it is undisputed that Baptist did not intend to immediately fire Moorer for these deficiencies until it was anticipated that he might take a leave to treat his alcoholism. The fact that Hill based Moorer's termination on these deficiencies, among others, but did not decide to effectuate the termination until Moorer took leave, could lead a fact finder to infer that Moorer would not have been fired absent his actual taking of that FMLA leave. This fact, combined with the fact that Moorer had called several of the termination reasons into question, shows that there was sufficient evidence presented for the factfinder to conclude that Baptist denied Moorer his substantive right to reinstatement. For these reasons, we hold that the district court erred in granting summary judgment for Baptist on Moorer's FMLA claim.

We do not believe that Moorer's claim that he was denied reinstatement because he took FMLA leave is inconsistent with the district court's finding after trial that Baptist terminated him because of a perceived disability, in violation of the ADA. There is nothing remarkable about an employer wrongfully discharging an employee on grounds that are illegal under more than one statute. For example, the termination of a 70 year-old woman could violate both Title VII of the Civil Rights Act of 1964 and the ADEA. An ageist employer who terminates a 64 year-old employee might violate both the ADEA and the Employee Retirement Income Security Act of 1974 ("ERISA"). *E.g.*, *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 613 (1993) ("Nor do we rule out the possibility of dual liability under ERISA and the ADEA where the decision to fire the employee was motivated both by the employee's age and by his pension status."). Likewise, discharging a disabled employee for complaining about not being provided overtime pay, unlike his similarly-situated, non-disabled co-workers, could violate both the Fair Labor Standards Act and the ADA. And, in this case, a fact finder would be permitted to infer that Baptist harbored a disability animus toward Moorer, but was unwilling to act on that animus (by firing him in violation of the ADA) until he was on FMLA leave. By terminating Moorer in this manner, Baptist exposed itself to liability under both statutes, and therefore Moorer was entitled to present both theories of liability to the fact finder.

## V.
### *Conclusion*

For all the foregoing reasons, we **AFFIRM** the judgment in favor of Moorer on his ADA claim, but **REVERSE** the district court's dismissal of his FMLA claim.

---

### CONCURRING IN PART, DISSENTING IN PART

---

BOGGS, Chief Judge, concurring in part and dissenting in part.  I concur in Judge Clay's well-reasoned opinion in Parts II and III, concerning Moorer's claim under the Americans with Disabilities Act.  However, I dissent from Part IV of the opinion, overturning Judge Donald's summary judgment on Moorer's claim under the Family and Medical Leave Act.  My reasoning is simple:  if, as the district court found and our court affirms, Moorer was fired because of illegal discrimination based on the perception that he was disabled, how can it also be that he was fired because of retaliation against him for taking FMLA leave?  In fact, there is not a shred of evidence that his firing had anything to do with his taking of FMLA leave.  The FMLA leave was directed by his employer, and Moorer had no objection to the taking of the leave in itself.  In fact, he seems to have believed that by taking the leave and other actions under the Employee Assistance Program, he would be taking steps to retain his job.

The majority's reasoning on this point relies on comparison to cases such as *Arban* where the reasons given for a firing were pretextual, and no other relevant events were occurring, other than  the taking of FMLA leave.  Under such circumstances, an inference sufficient to defeat summary judgment might be drawn, based on events "in connection with" the FMLA leave.

This is not at all the situation in the instant case.  The only "connection" with the FMLA leave is that Moorer was on FMLA leave when he was improperly fired for other reasons.  Moorer has never alleged any causal connection between his termination and his taking FMLA leave, and as the district court noted, has presented no evidence of such a connection.  Thus, no reasonable finder of fact could infer from the evidence before the district court that Moorer's termination was in any way related to his taking FMLA leave.

As an analogy, consider the situation of an employee who takes FMLA leave for clearly legitimate medical reasons, without any complaint or concern by anyone.  While on that leave, the employee's supervisor is replaced by a person with a long history of racism, who proceeds to fire the employee on pretextual grounds.  Under those circumstances, the employee would have a meritorious Title VII race discrimination claim, but would not have an FMLA claim.  The record before us supports an equivalent determination here, and I therefore respectfully dissent from the panel's reinstatement of the FMLA claim.